**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF NEW YORK,

        Plaintiff,

    v.

B.P. P.L.C., CHEVRON CORPORATION,
CONOCOPHILLIPS CORPORATION, EXXON
MOBIL CORPORATION, and ROYAL DUTCH
SHELL PLC,

        Defendants.

No. 18 Civ. 182 (JFK)

# MEMORANDUM OF LAW IN SUPPORT OF EXXON MOBIL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064

**O'MELVENY & MYERS**
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2889

*Counsel for Exxon Mobil Corporation*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ........................................................................................................................ 2

ARGUMENT .............................................................................................................................. 7

I.      Applicable Legal Standard .................................................................................................. 7

II.     The Due Process Clause Precludes the Exercise of Personal Jurisdiction over
ExxonMobil in New York. ................................................................................................. 8

        A.     ExxonMobil Is Not Subject to General Jurisdiction in New York. ....................... 9

        B.     ExxonMobil Is Not Subject to Specific Jurisdiction in New York for the
Claims Alleged in the Complaint......................................................................... 12

              1.     Plaintiff's Claims Do Not Arise out of ExxonMobil's Forum
Contacts........................................................................................... 13

              2.     The Complaint Has Not Adequately Alleged That ExxonMobil's
Limited Forum Contacts Caused the City's Claimed Injuries. .................. 14

              3.     The City Has Not Adequately Alleged Causation Even if
ExxonMobil's Alleged Worldwide Emissions Could Be Connected
to New York........................................................................................ 15

      CONCLUSION................................................................................................................... 18

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Absolute Activist Master Value Fund* v. *Ficeto*,
  No. 09 Civ. 8862 (GBD), 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ..............................17

*Banker* v. *Esperanza Health Sys.*, *Ltd.*,
  201 F. App'x 13 (2d Cir. 2006) .................................................................................................8

*BNSF Ry. Co.* v. *Tyrrell*,
  137 S. Ct. 1549 (2017)...................................................................................................11, 15

*Bristol-Myers Squibb Co.* v. *Superior Court*,
  137 S. Ct. 1773 (2017)................................................................................................ *passim*

*China Nat. Chartering Corp.* v. *Pactrans Air & Sea, Inc.*,
  882 F. Supp. 2d 579 (S.D.N.Y. 2012).....................................................................................12

*In re CIL Ltd.*,
  No. 13–11272–JLG, 2018 WL 329893 (Bankr. S.D.N.Y. Jan. 5, 2018)................................12

*Daimler AG* v. *Bauman*,
  134 S. Ct. 746 (2014)...................................................................................................9, 10

*Del Ponte* v. *Universal City Dev. Partners, Ltd.*,
  No. 07 Civ. 2360 (KMK), 2008 WL 169358 (S.D.N.Y. Jan. 16, 2008)................................13

*Fischer* v. *Enter. Rent-A-Car Co.*,
  Nos. CV-95-4876, CV-95-4938, 1996 WL 251426 (E.D.N.Y. Apr. 24, 1996) ....................10

*Gucci America, Inc.* v. *Weixing Li*,
  135 F. Supp. 3d 87 (S.D.N.Y. 2015).................................................................13, 15, 17

*Jazini* v. *Nissan Motor Co., Ltd.*,
  148 F.3d 181 (2d Cir. 1998)................................................................................................8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  No. 11 MDL 2262 (NRB), 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ........................15, 17

*MG Design Assocs., Corp.* v. *CoStar Realty Info., Inc.*,
  267 F. Supp. 3d 1000 (N.D. Ill. 2017) ...............................................................................12

*Native Village of Kivalina* v. *ExxonMobil Corp.*,
  663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd on other grounds,* 696 F.3d 849
  (9th Cir. 2012)...............................................................................................................16

*Penguin Group (USA) Inc.* v. *American Buddha*,
609 F.3d 30 (2d Cir. 2010)................................................................................7

*Pieczenik* v. *Dyax Corp.*,
265 F.3d 1329 (Fed. Cir. 2001)........................................................................10

*Purdue Pharma L.P.* v. *Collegium Pharm., Inc.*,
Civ. No. 15–260–SLR, 2015 WL 4653164 (D. Del. Aug. 6, 2015) ......................12

*Robinson* v. *Overseas Military Sales Corp.*,
21 F.3d 502 (2d Cir. 1994)..........................................................................7, 8

*In re Roman Catholic Diocese of Albany, N.Y., Inc.*,
745 F.3d 30 (2d Cir. 2014)......................................................................9, 10, 11

*Schwab Corp.* v. *Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018)................................................................................7

*State Farm Fire & Casualty Company* v. *Swizz Style, Inc.*,
246 F. Supp. 3d 880 (S.D.N.Y. 2017)................................................................12

*SEC.* v. *Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013)................................................................13

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 659 (2d Cir. 2013)........................................................................7, 11

*In re Terrorists Attacks on Sept. 11, 2001*,
740 F. Supp. 2d 494 (S.D.N.Y. 2010)................................................................11

*Univ. of Texas S.W. Med. Ctr.* v. *Nassar*,
133 S. Ct. 2517 (2013) ........................................................................13, 15, 16

## OTHER AUTHORITIES

Bob Van Voris, *New York Mayor Wants to Bring on "Death Knell" of Oil
Industry*, Bloomberg (Jan. 25, 2018),
https://www.bloomberg.com/news/articles/2018-01-26/new-york-mayor-
wants-to-bring-on-death-knell-of-oil-industry....................................................1, 4

Richard Heede, *Tracing Anthropogenic Carbon Dioxide and Methane Emissions
to Fossil Fuel and Cement Producers, 1854–2010*, Climatic Change, Jan.
2014..................................................................................................................4

Defendant Exxon Mobil Corporation ("ExxonMobil") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss it from this case for lack of personal jurisdiction.[1]

## PRELIMINARY STATEMENT

Frustrated by its inability to effectuate fundamental changes to the Nation's energy policy within the confines of our federal system, the City of New York (the "City") asks the Court to wade into a political thicket and, in the words of its Mayor, "bring the death knell" to the energy industry as we know it.[2]  To achieve this goal, the City invites the Court to pass judgment on the social utility of the "production, marketing, and sale of fossil fuels … since the dawn of the Industrial Revolution"—to weigh, with the benefit of hindsight, the relative costs and benefits of every business activity and decision ExxonMobil has undertaken in its 135-year history.  (ECF No. 80 ¶ 3.)  Putting to one side the justiciability of these policy questions, and the hypocrisy in the City's continued use of fossil fuels while advancing such claims, the Amended Complaint (the "Complaint") suffers from a defect that is simpler, but equally fatal:  it was filed in the wrong forum.

The same federal system that prevents the City from making international energy policy also cabins the authority of tribunals in New York State to judge—or, if the City's Mayor is to be believed, destroy—out-of-state actors like ExxonMobil, which is a Texas-based company incorporated in New Jersey.  Due process requires that if courts in New York are to sit in judgment of ExxonMobil, the plaintiff seeking that judgment must demonstrate that its injuries

---

[1]   As set forth in its Notice of Motion, ExxonMobil also moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6) for the reasons set forth in the Memorandum of Law of Chevron Corporation, ConocoPhillips, and Exxon Mobil Corporation Addressing Common Grounds In Support of their Motions to Dismiss.

[2]   Bob Van Voris, *New York Mayor Wants to Bring on "Death Knell" of Oil Industry*, Bloomberg (Jan. 25, 2018), https://www.bloomberg.com/news/articles/2018-01-26/new-york-mayor-wants-to-bring-on-death-knell-of-oil-industry.

would not have occurred but for ExxonMobil's activities in New York.

The City's pleading does not meet this standard, alleging a disparate series of connections to New York—of a type that many large companies would have with any forum—while claiming injuries from an undifferentiated global phenomenon allegedly caused by all fossil fuel combustion worldwide over the last two centuries.  Exercising personal jurisdiction over ExxonMobil in connection with the City's claims would thus discard well-settled principles that prevent a corporation from being called to answer for *all* of its business activities (current and historical) wherever it has conducted *any* of its business activities in its corporate history.  The Complaint fails to plead sufficient contacts to require ExxonMobil to defend itself against *these* claims in *this* forum, and ExxonMobil therefore should be dismissed from this case.

## BACKGROUND

The City's current Complaint (ECF No. 80) seeks to hold ExxonMobil and four other energy companies uniquely liable for virtually all of the alleged negative consequences of the energy system that humanity has developed and relied on over the past two centuries.

The City's initial complaint made no effort to establish jurisdiction by pleading that the City's claimed injuries were caused by ExxonMobil's conduct *in New York*, and, strikingly, the amended Complaint remains devoid of any allegation that the City's injuries would not have occurred absent ExxonMobil's activities *in New York*.  The current Complaint thus fares no better than the first, despite adopting a kitchen sink approach that recites nearly every conceivable connection between ExxonMobil and New York, no matter how unrelated to the City's claims.

As described in the Complaint, "the combustion and use of fossil fuels" leads to the emission of greenhouse gas, which "accumulates and remains in the atmosphere for up to

hundreds of years, where it traps heat, a process commonly referred to as 'climate change' or 'global warming.'" (Compl. ¶ 1.)  This warming, the Complaint asserts, leads to a number of "impacts, including hotter temperatures, longer and more severe heat waves, extreme precipitation events including heavy downpours, [and] rising sea levels." (*Id.*)  The Complaint alleges that these impacts are "harming New York City now." (*Id.* ¶ 2.)

Although the City seeks to lay *all* of the costs of responding to these phenomena at the feet of ExxonMobil and its co-defendants jointly and severally, the Complaint also freely acknowledges that dozens of others are similarly "responsible" for the state of affairs the City laments. (*Id.* ¶ 3.)  The Complaint also concedes that the "[g]reenhouse gas molecules" that may have caused the climatic conditions leading to the City's claimed injuries "cannot be traced to their source" because they "quickly diffuse and comingle in the atmosphere." (*Id.* ¶ 75.)  And the Complaint conspicuously fails to allege that any particular climate-related incident—whether a storm, heat wave, or other event—can be traced to particular emissions, let alone that those emissions can be traced to any emitter or underlying fossil fuel producer.

Despite acknowledging all this, the Complaint nevertheless alleges that "100 fossil fuel producers"—95 more than the five named in this lawsuit—are "responsible for 62% of all [greenhouse gas] emissions from industrial sources since the dawn of the Industrial Revolution and for 71% of emissions since 1988." (*Id.* ¶ 3.)  While ExxonMobil finds dubious the prospect that such emissions can be attributed at all in the numerical fashion attempted by the Complaint, by the City's own allegations it is not the defendants who are the *actual* emitters of the overwhelming majority of the greenhouse gases the City attributes to them.  In fact, the City acknowledges that "over 90% of these emissions are attributable to the fossil fuels that [producers] sell (rather than emit from their own operations)." (*Id.*)  In other words, an untold

3

number of third parties—virtually anybody who has used electricity, or travelled in a car or an airplane in the last 100 years—bears responsibility for the actual combustion of fossil fuels which emitted the greenhouse gases that purportedly caused the City's injuries.

The Complaint itself assigns ExxonMobil and its four co-defendants responsibility for only "11% of all the carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the dawn of the Industrial Revolution." (*Id.*) And according to the source cited by the Complaint, ExxonMobil is allegedly responsible, albeit indirectly, for only 3.2% of those emissions "from industrial sources."[3] Synthesizing these allegations, the Complaint (1) focuses on ExxonMobil's contribution to emissions only "from industrial sources" without disclosing the share of total emissions attributable to *non*-industrial sources; (2) concedes that 97% of the emissions "from industrial sources" have *no* connection to ExxonMobil *at all*; (3) admits that approximately 90% of the 3% of emissions "from industrial sources" that *may* have some connection to ExxonMobil were emitted by unknown third parties; and (4) fails to allege that *any* emissions even tangentially related to ExxonMobil have actually caused *any* of the City's injuries; to the contrary, the Complaint expressly concedes that emissions *cannot* be traced back to an emitter or fossil fuel producer. And based on these tenuous allegations, the City seeks to hold ExxonMobil jointly and severally liable for up to 100% of all present and future climate-related injuries New York City may suffer—as the City's Mayor told *The Bernie Sanders Show*, "[w]e're looking for billions" to "help bring the death knell to this industry."[4]

In contrast to the breathtakingly broad sweep of the City's claims, the Complaint's

---

[3]   Richard Heede, *Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854–2010*, Climatic Change, Jan. 2014 (cited at Compl. ¶ 3), https://link.springer.com/article/10.1007/s10584-013-0986-y (cited information contained at Table 3).

[4]   Bob Van Voris, *New York Mayor Wants to Bring on "Death Knell" of Oil Industry*, Bloomberg (Jan. 25, 2018), https://www.bloomberg.com/news/articles/2018-01-26/new-york-mayor-wants-to-bring-on-death-knell-of-oil-industry.

allegations regarding ExxonMobil's connections to New York are narrow and scattershot, even after the City elected to substantially overhaul those allegations in its amended filing. The Complaint alleges a number of connections between ExxonMobil and New York, many of which are decades old, and none of which can plausibly be labeled a "but for" cause of the City's claimed injury:

- *First*, that ExxonMobil is registered to do business in New York and has a designated agent for service here—two facts of no jurisdictional significance. (Compl. ¶ 32.)

- *Second*, that ExxonMobil's predecessors Exxon Corporation and Mobil Corporation maintained headquarters in New York prior to 1989—*nearly three decades ago*. (*Id.* ¶¶ 33-35.) And although the Complaint broadly alleges that ExxonMobil's predecessors made decisions at these offices to continue with fossil fuel production despite the risk of climate change, the Complaint fails to allege that the City's purported injuries would not have occurred absent some set of specific, identified decisions in New York.

- *Third*, that ExxonMobil supplies gasoline products that may be used in New York—in other words, ExxonMobil does business here. The Complaint asserts that ExxonMobil supplies products from its out-of-state refineries to "the New York Harbor area" via the Colonial Pipeline (which terminates in *New Jersey*),[5] and that ExxonMobil's predecessors *used to* operate other refineries *in New Jersey* more than 20 years ago, which likewise allegedly supplied gasoline to New York. (*Id.* ¶ 36.)

- *Fourth*, that ExxonMobil, "through its subsidiaries," produces oil in North Dakota that the City believes "is loaded onto railroad cars and shipped to locations including Albany, New York, where it is then loaded onto barges for delivery to refineries." (*Id.*) This allegation—which claims only that ExxonMobil products pass through New York on their way elsewhere—does not even suggest that it is ExxonMobil itself that brings those products to or through New York, or that these quantities of oil are sold or consumed in New York.

- *Fifth*, that "Exxon-branded gasoline stations" exist in New York State, and that ExxonMobil imposes contractual requirements on franchisees' sale of "otherwise fungible gasoline" under the ExxonMobil brand. (*Id.*) In other words, the Complaint alleges that ExxonMobil's trademarks are displayed at service stations in New York, and that franchisees agree to certain contractual duties in exchange for the right to display ExxonMobil's marks. The Complaint does not allege these service stations are owned or operated by ExxonMobil. Nor does it allege that these stations sell fossil fuels extracted by ExxonMobil.

---

[5]   *See* System Map | Colonial Pipeline, http://web.colpipe.com/home/about-colonial/system-map.

- *Sixth*, that ExxonMobil (largely in the past) owned or operated fuel storage or distribution facilities in New York—that is, that ExxonMobil was one of an unspecified number of members in the interstate and international logistics chain for gasoline production and sale. (*Id.*) Despite the detail of the City's allegations regarding ExxonMobil's legacy ownership of gasoline "terminals"—with citations to the supposed number of barrels of fuel these facilities could house—the City's allegations do not even allege that these terminals stored fuel extracted or sold by ExxonMobil nor, crucially, do they assert that the City's claimed climatic injuries would not have occurred absent ExxonMobil's alleged role as only one participant in the national gasoline distribution chain.

- *Seventh*, that the predecessors of ExxonMobil operated two oil refineries in New York—one that ceased operations *thirty-seven years ago* in 1981, and another that ceased operations *fifty years ago* in 1968. (*Id.* ¶ 37.) Here too, the Complaint fails to situate the claimed production of these refineries within the broader context of the fossil fuel industry; much less does the Complaint make any allegation that the City's claimed present and future injuries would not have occurred absent the operations at these two refineries, which ceased decades ago.

- *Eighth*, that "Exxon offers credit cards to consumers, through its interactive website, to promote sales of gasoline and other products at its branded gasoline stations" and "offer[s] consumers discounts" on gasoline at ExxonMobil-branded stations. (*Id.* ¶ 38.) These allegations do not reference New York at all, but instead simply describe purported aspects of the nationwide retail gasoline business without any suggestion that these activities are directed at New York or have any relation to the City's claimed injuries in this case.

- *Ninth*, and finally, that ExxonMobil "has used New York advertising firms to promote fossil fuel products." (*Id.*) This wholly generic allegation likewise fails to suggest that any services that may have been provided by New York-based advertising firms were rendered in New York, aimed at New York, or had any connection to the City's claimed injuries.

In sum, although it expands on the original pleading's jurisdictional allegations, the Complaint offers a mixture of specificity in irrelevant areas and conspicuous vagueness in others. Yet for all the new filler injected into the Complaint, it retains the fatal flaw of the City's original pleading: it fails to allege at all, much less plausibly, that the City's claimed climatic injuries would not have occurred absent ExxonMobil's activities in this State. On this unstable foundation, the City seeks to hale ExxonMobil into Court in a foreign forum to answer for climatic injuries supposedly caused by the sum total of ExxonMobil's worldwide business operations—and those of all other producers and consumers of fossil fuels—spanning the

6

company's entire 135-year history.

**ARGUMENT**

The New York contacts alleged in the Complaint do not supply a basis to compel ExxonMobil to defend the entirety of its worldwide business activities in a foreign forum.  As detailed below, to hold otherwise would be to abandon long-settled notions of due process and to instead endorse jurisdictional theories with no apparent limiting principle.

## I.    APPLICABLE LEGAL STANDARD

 "Personal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits—subject, of course, to certain constitutional limitations of due process." *Robinson* v. *Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994). Thus, for a federal court to accept jurisdiction over a non-resident defendant, even assuming *arguendo* that jurisdiction is authorized by the forum state's long-arm statute, jurisdiction must comply with the demanding strictures of due process.  As the party haling defendants into court, the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Group (USA) Inc.* v. *American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  This burden must be met as to each defendant, and "with respect to each claim asserted." *Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (citing *Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To carry its personal jurisdiction burden, a plaintiff's pleading "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (citation omitted).  And while pleadings "are construed in the light most favorable to the plaintiff," *Banker* v. *Esperanza Health Sys., Ltd.*, 201 F. App'x 13, 15 (2d Cir. 2006), when undertaking the personal jurisdiction analysis the Court need not "draw argumentative inferences

7

in the plaintiff's favor," *Robinson*, 21 F.3d at 507.  Nor must courts accept as true "a legal

conclusion couched as a factual allegation." *Jazini* v. *Nissan Motor Co., Ltd.*, 148 F.3d 181, 185

(2d Cir. 1998).

## II.   THE DUE PROCESS CLAUSE PRECLUDES THE EXERCISE OF PERSONAL JURISDICTION OVER EXXONMOBIL IN NEW YORK.

"[R]estrictions on personal jurisdiction 'are more than a guarantee of immunity from

inconvenient or distant litigation.  They are a consequence of territorial limitations on the power

of the respective States.'" *Bristol-Myers Squibb Co.* v. *Superior Court*, 137 S. Ct. 1773, 1780

(2017) (quoting *Hanson* v. *Denckla,* 357 U.S. 235, 251 (1958)).  Accordingly, as the Court in

*Bristol-Myers Squibb* explained mere months ago:

> Even if the defendant would suffer minimal or no inconvenience from being
> forced to litigate before the tribunals of another State; even if the forum State has
> a strong interest in applying its law to the controversy; even if the forum State is
> the most convenient location for litigation, the Due Process Clause, acting as an
> instrument of interstate federalism, may sometimes act to divest the State of its
> power to render a valid judgment.

137 S. Ct. at 1780-81 (quoting *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 294

(1980)).  In recognition of this bedrock principle of our federal system, the exercise of authority

over an out-of-state defendant is "'subject to review for compatibility with the Fourteenth

Amendment's Due Process Clause" because the "'assertion of jurisdiction exposes defendants to

the [forum] State's coercive power.'" *Bristol-Myers Squibb*, 137 S. Ct. at 1779 (quoting

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 918 (2011)).

The Due Process Clause cabins the authority of courts in a particular forum to inflict

coercive power on out-of-state defendants within "two types of personal jurisdiction: 'general'

(sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked')

jurisdiction." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citing *Goodyear*, 564 U.S. at 919).  A

court properly imbued with general jurisdiction may hear *any* claim against a defendant, even if

8

all the conduct underlying the claim occurred outside of the forum state. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citation omitted).  But our federal system limits the exercise of general jurisdiction over corporations to forums where a defendant "'is fairly regarded as at home.'"  *Id.* (quoting *Goodyear*, 564 U.S. at 924.)  Specific jurisdiction, by contrast, may be proper where a defendant is *not* "at home," but must be predicated on a substantial relationship between the forum and the discrete claim asserted—in other words, for a court "to exercise specific jurisdiction [over a particular defendant], 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'"  *Id.* (quoting *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 754 (2014)) (emphasis in original).  Application of these well-settled principles demonstrates that out-of-state defendant ExxonMobil is not susceptible to jurisdiction under either theory, and must be dismissed from this case.

> ### A.   ExxonMobil Is Not Subject to General Jurisdiction in New York.

ExxonMobil is not subject to so-called "general" jurisdiction in New York.  Due process permits courts to exercise general jurisdiction over a defendant—and hear any and all claims against that defendant—only when that defendant can be deemed "at home" in the forum state. *Bristol-Myers Squibb*, 137 S. Ct. at 1780.  But a defendant is only "at home" in a forum when it: (1) is incorporated in the forum; (2) has its principal place of business in that forum; or (3), in an "exceptional case," the defendant has operations that are "so substantial and of such a nature as to render the corporation at home" in the forum.  *Daimler*, 134 S. Ct. at 760-61, 761 n.19; *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 39 (2d Cir. 2014).

None of the above considerations applies to ExxonMobil.  By the Complaint's own telling, ExxonMobil is a New Jersey corporation with its "principal place of business" in Irving, Texas.  (Compl. ¶ 19.)  Nor do the allegations in the Complaint describe an "exceptional case" that could make ExxonMobil at home in New York despite its out-of-state incorporation and

principal place of business.  To the contrary, the Complaint alleges only scattershot connections between ExxonMobil and New York—that oil extracted by ExxonMobil may pass through New York, be stored in New York, or be sold in New York; that ExxonMobil may use a pipeline with a terminus *near* New York and *used to own* or operate facilities in New York that pale in comparison to its operations elsewhere; and that ExxonMobil's trademarks and advertisements may be displayed in New York pursuant to agreements with franchisees.[6]  These allegations, whether considered separately or collectively, do not render this an "exceptional case" that would make ExxonMobil "at home" here.  *Daimler*, 134 S. Ct. at 761 n.19; *In re Roman Catholic Diocese*, 745 F.3d at 39.  Indeed, ExxonMobil's present contacts with New York are no more extensive than those of many other "multinational, integrated" companies (Compl. ¶ 19) that conduct and support interstate commerce or engage in national advertising campaigns.  Put differently, if ExxonMobil could be deemed "at home" in New York based on the contacts described in the Complaint, a plethora of large companies would constitute "exceptional" cases—and the exception would impermissibly swallow the rule.

That is precisely what *Daimler* sought to avoid.  As Justice Ginsburg cautioned in *Daimler* and the Second Circuit echoed in *In re Roman Catholic Diocese*, "'[a] corporation that operates in many places can scarcely be deemed at home in all of them.'"  *In re Roman Catholic Diocese*, 745 F.3d at 41 (quoting *Daimler*, 134 S. Ct. at 762 n.20).  The exercise of general

---

[6]  The alleged licensing and/or franchise agreements with New York-based service stations described in the Complaint do not suffice to create jurisdiction over ExxonMobil in New York when analyzed against the requirements of due process.  Even beyond the strictures of due process, New York's long-arm statute does not subject franchisors to jurisdiction in New York based on the activities of franchisees.  *See, e.g. Fischer* v. *Enter. Rent-A-Car Co.*, Nos. CV-95-4876, CV-95-4938, 1996 WL 251426, at *3 (E.D.N.Y. Apr. 24, 1996) ("The New York courts have generally confirmed that absent other circumstances and business activities which tie a franchisor to New York for purposes of the cause of action, the fact that a franchisor licenses franchisees that operate in New York State will not subject the franchisor to personal jurisdiction in New York." (collecting cases)); *see also Pieczenik* v. *Dyax Corp.*, 265 F.3d 1329, 1335 (Fed. Cir. 2001) ("[T]he grant of licensing rights to a New York corporation does not constitute the transaction of business within the meaning of the New York long-arm statute.").

jurisdiction over ExxonMobil in this case—where plaintiffs plead only that a large corporation presently does business in a major center of commerce (among many other places) and engages in commonsense logistical activities to support that business—could be justified only by resort to a "doing business" theory that the law has "evolved" away from. *Id.* A finding of general jurisdiction over ExxonMobil in New York thus cannot be squared with the Supreme Court's recent precedents foreclosing such a theory. *See BNSF Ry. Co.* v. *Tyrrell*, 137 S. Ct. 1549, 1559 (2017) (declining to find an "exceptional case" justifying general jurisdiction in Montana, where a Texas-based Delaware corporation maintained "over 2,000 miles of railroad track and more than 2,000 employees").

This conclusion is not disturbed by the Complaint's allegation that two of ExxonMobil's predecessors, Exxon Corporation and Mobil Corporation, maintained central corporate offices in New York *nearly 30 years ago*. (Compl. ¶¶ 33, 35.) Those allegations simply cannot subject ExxonMobil to general jurisdiction in New York in 2018. That is because when considering the applicability of general jurisdiction—a theory predicated on the notion that it is no burden for a corporation to defend a lawsuit where it is "at home"—courts rightly focus on the defendant's status *at the time a suit is filed*. *See, e.g.*, *United Mobile Techs., LLC* v. *Pegaso PCS, S.A. de C.V.*, 509 F. App'x 48, 50 (2d Cir. 2013) (finding no general jurisdiction given the limited number of contacts "at the time of the filing of the complaint."); *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) ("general jurisdiction" requires plaintiff to show the requisite contacts "with the forum at the time the initial complaint was filed"); *In re Terrorists Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 507 (S.D.N.Y. 2010) ("[g]eneral jurisdiction" analyzed "at the time of the filing the complaint").[7]

---

[7]     *See also, e.g.*, *In re CIL Ltd.*, No. 13–11272–JLG, 2018 WL 329893, at \*13 (Bankr. S.D.N.Y. Jan. 5, 2018) (general jurisdiction requires "the plaintiff to demonstrate the defendant's 'continuous and systematic general

Accordingly, since *Daimler* and *Goodyear* adopted "more restrictive formulations" of "where a corporation is 'at home,'" *State Farm Fire & Casualty Company* v. *Swizz Style, Inc.*, 246 F. Supp. 3d 880, 889 (S.D.N.Y. 2017), courts have declined to find defendants "at home" in jurisdictions that, at the time of filing, merely *used to be* a defendant's home forum.  *See, e.g.*, *MG Design Assocs., Corp.* v. *CoStar Realty Info., Inc.*, 267 F. Supp. 3d 1000, 1014-15 (N.D. Ill. 2017) (rejecting general jurisdiction in Illinois over a defendant whose president was located in Illinois, and whose primary office was located in Illinois, less than two years prior to suit, because the defendant did not have sufficient contacts "at the time of this suit"); *Purdue Pharma L.P.* v. *Collegium Pharm., Inc.*,  Civ. No. 15–260–SLR, 2015 WL 4653164, at *4-5 (D. Del. Aug. 6, 2015) (rejecting general jurisdiction in Delaware over a defendant who had been incorporated in Delaware during the events leading up to the action giving rise to suit).  The same result follows here, and the fact that ExxonMobil's predecessors maintained corporate headquarters in New York in 1989 and earlier cannot be held to subject ExxonMobil to general jurisdiction in a foreign forum in 2018.

> **B.     ExxonMobil Is Not Subject to Specific Jurisdiction in New York for the Claims Alleged in the Complaint.**

The Due Process Clause likewise does not permit the exercise of specific jurisdiction over ExxonMobil in connection with the claims asserted by the City.  Specific jurisdiction may be proper where a claim asserted by a plaintiff "aris[es] out of or relat[es] to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Daimler*, 134 S. Ct.

---

business contacts' with the forum at the time the initial complaint was filed."); *China Nat. Chartering Corp.* v. *Pactrans Air & Sea, Inc.*, 882 F. Supp. 2d 579, 600 (S.D.N.Y. 2012) ("'[i]n assessing whether a defendants' [sic] contacts with New York are sufficient to establish general jurisdiction, the relevant question is whether the defendant was present in New York at the time the complaint was filed.'") (quoting *Duravest, Inc.* v. *Viscardi, A.G.*, 581 F. Supp. 2d 628, 638 (S.D.N.Y. 2008)).

at 754).

### 1.     Plaintiff's Claims Do Not Arise out of ExxonMobil's Forum Contacts.

In this Circuit, courts analyze whether a claim "arises out of" a defendant's forum

contacts by reference to a "sliding-scale test." *Gucci America, Inc.* v. *Weixing Li*, 135 F. Supp.

3d 87, 98 (S.D.N.Y. 2015) (citing *Chew* v. *Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).  Under this

"sliding-scale" analysis:

> [W]hen an entity has only limited contacts with a forum, relatedness requires that
> 'the plaintiff's injury was proximately caused by those contacts,' but when an
> entity's contacts with the forum 'are more substantial,' it is not unreasonable to
> exercise personal jurisdiction 'even though the acts within the state are not the
> proximate cause of the plaintiff's injury.'

*Gucci*, 135 F. Supp. 2d at 98 (quoting *Chew*, 143 F.3d at 29); *see also SEC.* v. *Straub*, 921 F.

Supp. 2d 244, 254 n. 6 (S.D.N.Y. 2013) (recognizing the analysis articulated in *Chew*); *Del*

*Ponte* v. *Universal City Dev. Partners, Ltd.*, No. 07 Civ. 2360 (KMK), 2008 WL 169358, at *9-

10 (S.D.N.Y. Jan. 16, 2008).  Yet even where a defendant's contacts with a forum are on the

"more substantial" end of the spectrum, a defendant's forum contacts must, at a minimum, "be a

'but for' cause of the plaintiff's injury."  *Gucci*, 135 F. Supp. 2d at 98 (quoting *In re LIBOR-*

*Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 4634541, at *23

(S.D.N.Y. Aug. 4, 2015)).

It is axiomatic that "but for" causation "requires the plaintiff to show that the harm would

not have occurred in the absence of" the conduct in question.  *Univ. of Texas S.W. Med. Ctr.* v.

*Nassar*, 133 S. Ct. 2517, 2525 (2013) (citation omitted).  Put differently, it is "textbook" law

"that an action 'is not regarded as a cause of an event if the particular event would have occurred

without it.'"  *Id.* (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on*

*Law of Torts* 265 (5th ed. 1984)).[8]

2.      **The Complaint Has Not Adequately Alleged That ExxonMobil's Limited Forum Contacts Caused the City's Claimed Injuries.**

Even taking as true the Complaint's allegations connecting ExxonMobil to New York,[9] those connections are not a "but for" cause of the injuries the City has alleged, much less the proximate cause of such injuries.  According to the Complaint, the City's claimed injuries consist of increased temperatures in the City, rising sea levels, increased flooding from coastal storms, and "extreme precipitation events" that allegedly resulted from the greenhouse effect.  (Compl. ¶ 10.)  Even though the Complaint claims to take issue with the *extraction* and *promotion* of fossil fuels, not the emissions from their combustion, the City's pleading makes clear that the greenhouse effect leading to the City's claimed injuries is the result of worldwide greenhouse gas emissions caused by fossil fuel combustion since "the dawn of the Industrial Revolution."  (*See, e.g.*, Compl. ¶¶ 1, 3.)  And the Complaint makes clear that "emissions remain in the atmosphere for up to hundreds of years," (Compl. ¶ 50) and "quickly diffuse and comingle in the atmosphere," (*Id.* ¶ 75) confounding any attempt to connect the claimed injuries suffered by the City to any emissions occurring at any given place or time, or emanating from any particular emitter or fossil fuel producer.

Indeed, the Complaint does not even attempt to shoulder the burden of establishing jurisdiction over ExxonMobil, as it fails to even allege a direct causal relationship between

---

8   In *Bristol-Myers Squibb*, the Supreme Court rejected the California courts' "sliding scale approach" whereby specific jurisdiction could be asserted over claims without forum contacts if a defendant had other, "wide ranging" contacts with the forum.  137 S. Ct. at 1775-76, 1781-82.  The "sliding scale approach" rejected in *Bristol-Myers Squibb* is thus distinct from the similarly named test laid out in *Chew* and ExxonMobil is not aware of any case that has questioned the vitality of *Chew* in light of *Bristol-Myers Squibb*.  In any event, the Complaint fails to satisfactorily plead the existence of personal jurisdiction even applying the most forgiving standard permitted by *Chew*—that of "but for" causation.

9   ExxonMobil does not concede the accuracy of the Complaint's allegations about the company's New York contacts, but simply assumes their truth for purposes of this motion.

ExxonMobil's conduct in New York and any particular emissions (in New York or elsewhere), any purported climate event supposedly caused by such emissions (in New York or elsewhere), or to the specific injuries claimed by the City.  Simply put, the Complaint fails to allege at all that the climatic injuries the City claims it suffered—which, in the Complaint's own telling, are the combined result of all fossil fuel combustion since the Industrial Revolution—*would not have occurred* absent the New York contacts it cites: limited quantities of oil traversing New York or being stored or sold in New York, ExxonMobil branding and discounts displayed at service stations in New York, and the general operation of an international business that long ago had executives in New York.  *Univ. of Texas S.W. Med. Ctr.*, 133 S. Ct. at 2525.  Plaintiff's allegations thus fall short of plausibly alleging the causal link needed to support jurisdiction.

To the contrary, finding the necessary causal link based on the City's allegations would require the assumption of facts that are both unpled and self-evidently false, and the creation of Rube Goldberg theories of causation that appear nowhere in the Complaint, and which cannot suffice under the law of this Circuit to establish that the City's claimed injuries "arise out of" the alleged contacts between ExxonMobil and New York.  *Gucci*, 135 F. Supp. 3d at 96; *In re LIBOR*, 2015 WL 4634541, at *23.  Instead, the jurisdictional theory the Complaint implicitly embraces—that business operations in any forum can subject a company to general jurisdiction for *all* of its business operations worldwide for the company's entire history —was rejected by the Supreme Court less than a year ago when it held that mere "[i]n-state business . . . does not suffice to permit the assertion of general jurisdiction."  *BNSF Ry. Co.*, 137 S. Ct. at 1559.

### 3.    The City Has Not Adequately Alleged Causation Even if ExxonMobil's Alleged Worldwide Emissions Could Be Connected to New York.

The Complaint's failure to allege a causal link between ExxonMobil's conduct and the City's alleged injuries would be the same even if *all* of the *worldwide* emissions attributed to

ExxonMobil in the Complaint could be tied to New York.  The Complaint alleges that ExxonMobil and its co-defendants are collectively indirectly responsible for a mere 11% of emissions "from industrial sources" in the modern era.  (Compl. ¶ 3.)  According to the sources cited by the City, the *worldwide* conduct of ExxonMobil accounts for just 3.2% of the subset of emissions "from industrial sources."  (*Id*.)

Tellingly, the City does not allege that the specific climatic conditions it complains of "would not have occurred" absent the 3.2% of emissions purportedly generated by ExxonMobil's products.  *Univ. of Texas S.W. Med. Ctr.*, 133 S. Ct. at 2525.  That is for good reason:  federal courts have recognized the inherent impossibility of drawing a causal link between any particular emissions and discrete climatic impacts.  As explained by the U.S. District Court for the Northern District of California in a similar case brought by Matthew Pawa, the City's private attorney in this matter:

> [T]he undifferentiated nature of greenhouse gas emissions from all global sources and their worldwide accumulation over long periods of time … makes clear that there is no realistic possibility of tracing any particular alleged effect of global warming to any particular emissions by any specific person, entity, or group at any particular point in time.

*Native Village of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009), *aff'd on other grounds,* 696 F.3d 849 (9th Cir. 2012).  The City's pleading in this case concedes as much, freely admitting that "[g]reenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere" (Compl. ¶ 75) and that "emissions remain in the atmosphere for up to hundreds of years" (Compl. ¶ 50).  Under such circumstances, as *Kivalina* concluded, "it is not plausible to state which emissions—emitted by whom and at what time in the last several centuries and at what place in the world—'caused' Plaintiffs' alleged global warming related injuries."  663 F. Supp. 2d at 881; *cf. Bristol-Myers Squibb*, 137 S. Ct. at 1783 (finding that defendant's use of an in-state distributor could not justify

specific jurisdiction because the plaintiffs "have adduced no evidence to show how or by whom the [drug] they took was distributed to the pharmacies that dispensed it to them," and observing that "[i]t is impossible to trace a particular pill" that injured a specific plaintiff to the forum-based distributor).

The same conclusion follows here, and thus even if *all* of the claimed ExxonMobil-related emissions arose out of its New York contacts, it would be impossible to conclude that they are a "but for" cause of the injuries the City complains of, rendering specific jurisdiction improper.  *Gucci*, 135 F. Supp. 3d at 98; *In re LIBOR*, 2015 WL 4634541, at *23.  As a result, even if the Court were to accept the City's suggestion that decisions made "in New York" are responsible for *all* of Exxon's and Mobil's worldwide conduct during their time headquartered in New York prior to 1989, that would not alter the conclusion:  ExxonMobil's *worldwide* conduct, as a whole, cannot be said to have caused the City's injuries.

In sum, the Complaint does not, and cannot, plead that the City would not have been injured but for ExxonMobil's conduct *in New York*.  Accordingly, ExxonMobil cannot be subject to jurisdiction in this forum under the law of this Circuit.  To hold otherwise would be to endorse the precise sort of "loose and spurious form of general jurisdiction" that the Supreme Court in *Bristol-Myers Squibb* explicitly rejected mere months ago.  137 S. Ct. at 1776.  *Cf. Absolute Activist Master Value Fund* v. *Ficeto*, No. 09 Civ. 8862 (GBD), 2013 WL 1286170, at *12 (S.D.N.Y. Mar. 28, 2013) (dismissing a Swiss defendant for want of personal jurisdiction because the forum contacts were "at best, attenuated, 'but for' causes of the injury," and were "insufficient to confer personal jurisdiction under Second Circuit precedent").

## CONCLUSION

To find ExxonMobil subject to personal jurisdiction in New York for the claims asserted in the Complaint would be an endorsement of jurisdictional principles that extend well past the boundaries marked by the Supreme Court.  The contacts between ExxonMobil and New York State claimed in the Complaint could describe any number of large corporations around the world.  If, as the City urges, a multinational corporation can be forced to answer for *all* of its historical business activities wherever it has conducted *any* historical business activities, that would spell the end of the long-standing requirement that the injury would not have occurred but for the defendant's contacts with the forum.  That is not, and should not be, the law.  The City has thus pursued its claims in an improper forum, and ExxonMobil should be dismissed from this case.

Dated: March 30, 2018

**EXXON MOBIL CORPORATION**

By: /s/ Theodore V. Wells, Jr.      
Theodore V. Wells, Jr.
twells@paulweiss.com
Daniel J. Toal
dtoal@paulweiss.com
Jaren Janghorbani
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

M. Randall Oppenheimer
(*pro hac vice* forthcoming)
roppenheimer@omm.com
Dawn Sestito
(*pro hac vice* forthcoming)
dsestito@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
(213) 430-6000
Fax: (213) 430-6407

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
1301 Fannin Street
Houston, TX 77002-7014
(832) 624-6336
Fax: (262) 313-2402

*Counsel for Exxon Mobil Corporation*