**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CITY OF NEW YORK,

                Plaintiff,

    v.

BP P.L.C.; CHEVRON CORPORATION; CONOCOPHILLIPS; EXXON MOBIL CORPORATION; and ROYAL DUTCH SHELL PLC,

                Defendants.

Case No. 18 Civ. 182 (JFK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW OF CHEVRON CORPORATION, CONOCOPHILLIPS, AND EXXON MOBIL CORPORATION ADDRESSING COMMON GROUNDS IN SUPPORT OF THEIR MOTIONS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendant Chevron Corporation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.      FACTUAL BACKGROUND ....................................................................................... 3

A.      Global Warming Is a National and Global Issue ..................................................... 3

B.      Plaintiff Seeks to Hold Five Energy Producers Solely Liable for Global Warming ......... 5

II.     LEGAL STANDARD ................................................................................................. 6

III.    ARGUMENT .............................................................................................................. 7

A.      Plaintiff's Claims Arise Under Federal Common Law and Should Be Dismissed ........... 7

        1.      Notwithstanding their state-law labels, Plaintiff's claims arise under
                federal common law ...................................................................................... 8

        2.      Congress has displaced federal common law governing global warming-
                based tort claims .......................................................................................... 12

        3.      Alternatively, Plaintiff has failed to plead a viable federal common law
                claim .............................................................................................................. 15

B.      Plaintiff's Claims Are Independently Barred by Numerous Federal Doctrines .............. 16

        1.      Plaintiff's claims infringe on the federal foreign affairs power ..................... 17

        2.      Plaintiff's claims are barred by the Commerce Clause ................................. 19

        3.      Plaintiff's claims are barred by the Due Process and Takings Clauses ......... 22

        4.      Plaintiff's claims are preempted by federal law ........................................... 23

C.      The Amended Complaint Does Not Allege Viable State-Law Claims ........................... 26

        1.      Plaintiff's claims have no basis in New York nuisance or trespass law ......... 26

        2.      Plaintiff fails to plausibly demonstrate that Defendants proximately
                caused the alleged injuries .......................................................................... 27

        3.      Plaintiff does not adequately plead lack of justification or permission ......... 29

        4.      Plaintiff's claims are barred by the *in pari delicto* doctrine .................... 30

D.      Plaintiff's Claims Are Not Justiciable ................................................................... 31

1.      Plaintiff's novel claims do not present a justiciable case or controversy ............ 31

2.      Plaintiff's claims present non-justiciable political questions................................ 32

3.      Plaintiff lacks Article III standing......................................................................... 34

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Rep. of Yugoslavia*,
  218 F.3d 152 (2d Cir. 2000)....................................................................................7

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  2010 WL 2077214 (S.D.N.Y. May 14, 2010) .......................................................35

*Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*,
  737 F.3d 166 (2d Cir. 2013)..................................................................................29

*In re Agent Orange Prod. Liab. Litig.*,
  517 F.3d 76 (2d Cir. 2008)....................................................................................22

*Alfred Dunhill of London, Inc. v. Rep. of Cuba*,
  425 U.S. 682 (1976)...............................................................................................19

*Am. Elec. Power. Co. v. Connecticut*,
  564 U.S. 410 (2011).......................................2, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 24, 31, 33, 34

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003).........................................................................2, 6, 17, 18, 19, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................6

*In re Assicurazioni Generali, S.P.A.*,
  592 F.3d 113 (2d Cir. 2010)..................................................................................17

*Baker v. Carr*,
  369 U.S. 186 (1962)...............................................................................................32

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
  512 U.S. 298 (1994)...............................................................................................20

*Beauchamp v. Excelsior Brick Co. of Haverstraw*,
  127 N.Y.S. 686 (2d Dep't 1911)...........................................................................29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................6

*In re Bernard L. Madoff Secs. LLC*,
  721 F.3d 54 (2d Cir. 2013)....................................................................................31

*BMW of N. Am. v. Gore*,
  517 U.S. 559 (1996)...................................................................................20, 21, 22

*Bordenkircher v. Hayes*,
  434 U.S. 357 (1978)...................................................................................22

*Boring v. Town of Babylon*,
  47 N.Y.S.3d 419 (2d Dep't 2017)...............................................................30

*Boyle v. United Tech. Corp.*,
  487 U.S. 500 (1988)...................................................................................24

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001).............................................................................6, 23

*California v. Gen. Motors Corp.*,
  2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) .........................7, 15, 17, 18, 19, 32, 33, 34, 35

*Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
  273 F.3d 536 (3d Cir. 2001).......................................................................28

*City of Chicago v. Am. Cyanamid Co.*,
  355 Ill. App. 3d 209 (2005) .......................................................................28

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004).......................................................................26

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981).........................................................................8, 9, 12, 15

*City of New York v. A.E. Sales LLC*,
  2005 WL 3782442 (S.D.N.Y. Feb. 9, 2005)................................................26

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...................................................................................35

*Comer v. Murphy Oil USA, Inc.*,
  839 F. Supp. 2d 849 (S.D. Miss. 2012)..............................................7, 15, 32, 34

*Connecticut v. Am. Elec. Power Co., Inc.*,
  582 F.3d 309 (2d Cir. 2009)........................................................................10

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
  615 F.3d 291 (4th Cir. 2010) ................................................................24, 25

*Copart Indus., Inc. v. Consol. Edison Co. of N.Y., Inc.*,
  41 N.Y.2d 564 (1977) ................................................................................15

*County of San Mateo v. Chevron Corp.*,
  2018 WL 1414774 (N.D. Cal. Mar. 16, 2018).............................................7, 8, 15

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000)................................................................18, 19

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009).................................................34, 35

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)................................................................31, 32

*De Jesus v. Sears, Roebuck & Co.*,
    87 F.3d 65 (2d Cir. 1996) .............................................................5

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980).....................................................................32

*Doe v. Va. Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) .......................................................35

*Donovan v. Rothman*,
    756 N.Y.S.2d 514 (1st Dep't 2003) .............................................31

*Eastern Enterprises v. Apfel*,
    524 U.S. 498 (1998)................................................................22, 23

*EDF Renewable Dev. Inc.* v. *Tritec Real Estate Co., Inc.*,
    147 F. Supp. 3d 63 (E.D.N.Y. 2015) ..........................................22

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938).........................................................................8

*Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters*,
    61 F. Supp. 2d 740 (S.D. Ohio 1999) .........................................23

*Frederique v. Cty. of Nassau*,
    168 F. Supp. 3d 455 (E.D.N.Y. 2016) ........................................30

*Ganim v. Smith & Wesson Corp.*,
    258 Conn. 313 (2001) ..................................................................28

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000).....................................................................25

*Gen-Probe, Inc.* v. *Amoco Corp., Inc.*,
    926 F. Supp. 948 (S.D. Cal. 1996) ..............................................22

*Hamilton v. Beretta U.S.A. Corp.*,
    96 N.Y.2d 222 (2001) .......................................................2, 26, 28

*Healy v. Beer Inst.*,
    491 U.S. 324 (1989)..................................................................................................19, 21

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972)............................................................................................9, 10, 11, 16

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)...........................................................................8, 9, 11, 12, 21, 24, 25

*Janki Bai Sahu v. Union Carbide Corp.*,
    528 F. App'x 96 (2d Cir. 2013) .................................................................................27

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986)....................................................................................................32

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ...........................................................................................30, 31

*Korsinsky v. Rose*,
    993 N.Y.S.2d 92 (2d Dep't 2014) ...........................................................................30

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012)....................................................................................................18

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999)......................................................................................16

*Lead Indus. Ass'n, Inc. v. EPA*,
    647 F.2d 1130 (D.C. Cir. 1980) ...............................................................................24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)....................................................................................................34

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................................................................13

*McConnell v. Commonwealth Pictures Corp.*,
    7 N.Y.2d 465 (1960) ..................................................................................................30

*Me. Yankee Atomic Power Co. v. United States*,
    44 Fed. Cl. 372 (1999) ..............................................................................................23

*In re MF Global Holdings Ltd. Inv. Litig.*,
    998 F. Supp. 2d 157 (S.D.N.Y. 2014)......................................................................30

*Middlesex Cty. Sewage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981)........................................................................................................16

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
    612 F.3d 97 (2d Cir. 2010)........................................................................23

*In re Nassau Cty. Consol. MTBE (Methyl Tertiary Butyl Ether) Prod. Liab. Litig.*,
    918 N.Y.S.2d 399 (Sup. Ct. 2010)......................................................27, 28

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) ...........................................10, 33

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012) ...............................2, 7, 10, 11, 12, 13, 14, 15, 32, 33

*New Jersey v. New York*,
    345 U.S. 369 (1953)...............................................................................16

*In re Oswego Barge Corp.*,
    664 F.2d 327 (2d Cir. 1981)..................................................................13

*Parker Madison Partners v. Airbnb, Inc.*,
    2017 WL 4357952 (S.D.N.Y. Sept. 29, 2017).......................................34

*In re Paulsboro Derailment Cases*,
    2013 WL 5530046 (D.N.J. Oct. 4, 2013)..............................................26

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)...............................................................................32

*People of the State of Cal. v. BP P.L.C.*,
    2018 WL 1064293 (N.D. Cal. Feb. 27, 2018) .........................7, 11, 12, 13, 14, 16

*Peterson v. Islamic Republic of Iran*,
    758 F.3d 185 (2d Cir. 2014)..................................................................23

*Pinter v. Dahl*,
    486 U.S. 622 (1988)...............................................................................30

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    215 F. Supp. 2d 336 (S.D.N.Y. 2002)..................................................29

*Rodriguez v. Budget Rent-A-Car Sys., Inc.*,
    841 N.Y.S.2d 486 (1st Dep't 2007) .....................................................29

*S.-Cent. Timber Dev., Inc. v. Wunnicke*,
    467 U.S. 82 (1984).................................................................................20

*Sahu v. Union Carbide Corp.*,
    2014 WL 3765556 (S.D.N.Y. July 30, 2014)..................................27, 28

*San Diego Bldg. Trades Council v. Garmon*,
  359 U.S. 236 (1959)..................................................................................18, 21

*Simon v. E. Kentucky Welfare Rights Org.*,
  426 U.S. 26 (1976).........................................................................................35

*Smith v. 2328 Univ. Ave. Corp.*,
  859 N.Y.S.2d 71 (1st Dep't 2008) .................................................................27

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004).......................................................................................16

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
  632 F.3d 938 (5th Cir. 2011) .........................................................................19

*Spitzer v. Sturm, Ruger & Co., Inc.*,
  761 N.Y.S.2d 192 (1st Dep't 2003) ...............................................2, 26, 27, 28, 29

*State Farm Mut. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003).......................................................................................22

*Sweet v. Sheahan*,
  235 F.3d 80 (2d Cir. 2000).............................................................................23

*Tex. Indus. Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981)..........................................................................................8

*Town of Islip v. Datre*,
  245 F. Supp. 3d 397 (E.D.N.Y. 2017) ...........................................................28

*Town of Oyster Bay v. Lizza Indus., Inc.*,
  22 N.Y.3d 1024 (2013)...................................................................................21

*United States v. Alcan Aluminum Corp.*,
  315 F.3d 179 (2d Cir. 2003)...........................................................................23

*United States v. Pink*,
  315 U.S. 203 (1942).......................................................................................32

*United States v. Standard Oil Co. of Cal.*,
  332 U.S. 301 (1947)..........................................................................................8

*Verizon Comm'cns Inc. v. Law Offices of Curtis v. Tinko, LLP*,
  540 U.S. 398 (2004).......................................................................................32

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004).......................................................................................33

*W. Lynn Creamery, Inc. v. Healy,*
   512 U.S. 186 (1994)...............................................................................................21

*Wachovia Bank, N.A. v. Burke,*
   414 F.3d 305 (2d Cir. 2005)..............................................................................23

*Wash. Envtl. Council v. Bellon,*
   732 F.3d 1131 (9th Cir. 2013) ...........................................................................35

*Weiler v. Chatham Forest Prods., Inc.,*
   392 F.3d 532 (2d Cir. 2004)...............................................................................13

*Whiteman v. Dorotheum GmbH & Co. KG,*
   431 F.3d 57 (2d Cir. 2005).................................................................................32

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990)...........................................................................................34

*Xerox Corp. v. Harris Cty., Tex.,*
   459 U.S. 145 (1982)...........................................................................................25

**Statutes**

10 U.S.C. § 7422 ......................................................................................................25

15 U.S.C. § 2901 ........................................................................................................4

15 U.S.C. § 2901 ........................................................................................................4

15 U.S.C. § 2921 ........................................................................................................4

15 U.S.C. § 2933 ........................................................................................................4

15 U.S.C. § 2936 ........................................................................................................4

15 U.S.C. § 2952 ........................................................................................................4

30 U.S.C. § 21a ........................................................................................................26

30 U.S.C. § 201 ........................................................................................................25

30 U.S.C. § 1201 ......................................................................................................26

42 U.S.C. § 5801 ......................................................................................................26

42 U.S.C. § 6201 ........................................................................................................5

42 U.S.C. § 7401 ........................................................................................................4

42 U.S.C. § 7411 ................................................................................................24

42 U.S.C. § 7601 ..................................................................................................4

42 U.S.C. § 13389 ...........................................................................................4, 26

42 U.S.C. § 17001 ................................................................................................4

43 U.S.C. § 1802 ................................................................................................25

Congress. Energy Policy Act of 1992, Pub. L. No. 102-486, § 1604, 106 Stat.
    2776 (codified at 42 U.S.C. § 13384 *et seq.*) .............................................4

N.Y. Envtl. Conserv. Law § 23-03016 ..............................................................5, 6

Pub. L. No. 105-276, 112 Stat. 2461 (1998) ........................................................5

Pub. L. No. 106-74, 113 Stat. 1047 (1999) ..........................................................5

Pub. L. No. 106-377, 114 Stat. 1441 (2000) ........................................................5

**Other Authorities**

*California v. BP P.L.C., et al.*, No. 17-cv-06011, ECF No. 159 (N.D. Cal. Mar.
    20, 2018) .................................................................................................14, 16

Graham Ruddick, *Donald Trump says US could re-enter Paris climate deal*, The
    Guardian (Jan. 28, 2018), http://bit.ly/2niJFsW ........................................17

Heather Richards, *Lawmakers propose tax cut for oil and gas in Wyoming*, Casper
    Star Tribune (Feb. 14, 2018), http://bit.ly/2FfEmm4V.................................21

Inventory of New York City Greenhouse Gas Emissions in 2015 (Apr. 2017),
    http://on.ny.gov/2nPATCT ...........................................................................30

Michael D. Shear, *Trump Will Withdraw U.S. From Paris Climate Agreement*,
    N.Y. Times (June 1, 2017), http://nyti.ms/2wNIm17 .....................................5

New York, *1.5° C, Aligning New York City with the Paris Climate Agreement*
    (Sept. 2017)....................................................................................................3

New York, *Building a Stronger, More Resilient New York* (2013)..............................31

NYC Clean Fleet (2015), http://on.nyc.gov/1T629Eo.................................................30

Remarks by President Trump at the Unleashing American Energy Event (June 29,
    2017), http://bit.ly/2El7yWU ..........................................................................5

S. Rep. No. 109-78............................................................................................26

S. Res. 98, 105th Cong. (1997)................................................................................5

*Transcript: Mayor de Blasio Appears Live On The Bernie Show With Senator Bernie Sanders* (Jan. 25, 2018), http://on.nyc.gov/2F14B1k..................................18

U.S. Env'tl Prot. Agency, Regulations for Greenhouse Gas Emissions from Passenger Cars and Trucks, http://bit.ly/2EWvcKK...............................................4

UNFCCC Recitals, http://bit.ly/1BQK8Wg ...............................................................3

UNFCCC, *Status of Ratification of the Convention*, http://bit.ly/1ujgxQ3 ...................3

**Treatises**

Restatement (Second) of Torts § 432............................................................................29

**Regulations**

10 C.F.R. § 626.6 ........................................................................................................5

30 C.F.R. § 550.120 .................................................................................................5, 25

30 C.F.R. § 745.13 ......................................................................................................5

43 C.F.R. § 3162.1 .......................................................................................................5

43 C.F.R. § 3162.1 .....................................................................................................25

N.Y.C. Admin. Code § 24-168.1 ...............................................................................30

N.Y.C. Admin. Code § 24-169 ..................................................................................30

## PRELIMINARY STATEMENT

Plaintiff seeks to hold five publicly traded energy companies liable for the impacts of global warming.  Relying on state-law causes of action, Plaintiff alleges harms it claims are the result of worldwide fossil fuel production and global greenhouse gas emissions by countless nonparties, including the City of New York and its own citizens and businesses.  Plaintiff's claims are not limited to harms caused by fossil fuels extracted, sold, marketed, or used in New York.  Instead, Plaintiff attempts to use state tort law to regulate the nationwide—indeed, worldwide—activity of companies that play a key role in virtually every sector of the global economy, supplying the fuels that enable production and innovation, literally keep the lights and heat on, power nearly every form of transportation, and form the basic materials from which innumerable consumer, technological, and medical devices are fashioned.  The Amended Complaint puts squarely at issue federal statutory, regulatory, and constitutional issues; aims to upset bedrock federal-state divisions of responsibility; and has profound implications for the global economy, international relations, and America's national security.  For these reasons and more, cases asserting nearly identical claims—including several filed by the same private lawyers representing Plaintiff here—have been universally rejected by U.S. courts.  The result here should be the same.

The Amended Complaint's conflict with federal law and policy could not be starker.  For nearly 50 years, the federal government has aimed to achieve energy independence by decreasing the Nation's reliance on oil imports, including by opening federal lands and coastal areas to promote fossil fuel extraction, establishing strategic petroleum reserves, and contracting with fossil fuel companies to develop those resources.  During this time, the U.S. has also enacted environmental statutes and regulations designed to strike an appropriate—and evolving—balance between protecting the environment and ensuring the energy supply for economic and national

security.  U.S. foreign policy has pursued these dual goals by negotiating with other countries to craft workable international frameworks to respond to global warming while evaluating how such regulation could affect the economy, national security, and foreign relations.  This lawsuit takes issue with, and runs counter to, these decisions, threatening to upend the government's longstanding energy and environmental policies and "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" on global warming issues.  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003).

This case is about *global* production and *global* emissions, not a local nuisance.  Plaintiff asks this Court to disregard the recognized boundaries of tort law and hold these select Defendants liable for the actions of literally billions of intervening third parties not just in New York, but around the world.  After all, Plaintiff targets *global* warming, and the interstate and transnational conduct that term entails.  These claims cannot be adjudicated without deciding whether the benefits of using fossil fuels are outweighed by the costs, not just in New York, but throughout the U.S. and worldwide.  Under well-established principles of federal law, such claims cannot proceed.  That is why earlier, similar lawsuits targeting this same issue were dismissed.  *See, e.g.*, *Am. Elec. Power. Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012).  Moreover, New York courts are "cautious in imposing novel theories of tort liability," especially when the defendant's alleged duties remain "the focus of a national policy debate," and they have already rejected Plaintiff's theory of causation.  *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 239–40 (2001); *Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d 192, 196–97, 202–03 (1st Dep't 2003).  This Amended Complaint, which asserts already-rejected claims based on already-rejected theories, should be dismissed.

# I.    FACTUAL BACKGROUND

## A.    Global Warming Is a National and Global Issue

Global warming is an important international issue that concerns every nation on Earth. Plaintiff does not contend that global warming is a localized issue, unique to the City of New York, but rather alleges that worldwide greenhouse gas emissions, which "cannot be traced to their source," have caused global temperatures to rise, and that this global warming is leading to effects all around the world.  Amended Complaint ("FAC") ¶¶ 54–55, 75.  Indeed, Plaintiff admits that this case is about preventing global warming impacts "both locally and globally." *Id.* ¶ 56.

As an issue of national and international significance, addressing global warming has been the subject of decades of federal laws and regulations, collaborative research, political negotiations, and diplomatic engagement with other countries.  International discussions, which began more than 30 years ago, led to the adoption of the United Nations Framework Convention on Climate Change ("UNFCCC"), which the U.S. signed and the Senate ratified in 1992.  *See* UNFCCC, *Status of Ratification of the Convention*, http://bit.ly/1ujgxQ3.  Noting that global warming was "a common concern of humankind," the UNFCCC "[a]cknowledg[ed] that the global nature of climate change calls for the widest possible cooperation by all countries and their participation in an effective and appropriate international response."  UNFCCC Recitals, http://bit.ly/1BQK8Wg.  Plaintiff itself recently recognized that it cannot address global warming "on its own," and that "[c]ities, states, the federal government, and international partners must work together" on this important global issue.  City of New York, *1.5° C, Aligning New York City with the Paris Climate Agreement*, at 30 (Sept. 2017) (cited at FAC ¶ 56 n.16).

The United States has acted at the national level to address global warming while balancing important economic and social interests.  As early as 1978, Congress established a

"national climate program" to improve the country's understanding of global warming through enhanced research, information collection and dissemination, and international cooperation. *See* Nat'l Climate Program Act of 1978, 15 U.S.C. § 2901 *et seq.* Following this, in the Global Climate Protection Act of 1987, Congress recognized the uniquely international character of global warming and directed the Secretary of State to coordinate U.S. negotiations on the issue. *See* 15 U.S.C. § 2901 note; *see also* 15 U.S.C. § 2952(a).[1]

In the Clean Air Act, Congress established a comprehensive scheme to promote and balance multiple objectives, deploying resources to "protect and enhance the quality of the Nation's air resources, so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Congress authorized the Environmental Protection Agency ("EPA") to regulate air pollutants like greenhouse gas emissions, and EPA has exercised this authority on its own and with other agencies.[2] *Id.* § 7601. Other laws, like the Energy Policy Act of 2005 and the Energy Independence and Security Act of 2007, sought further reductions of greenhouse gas emissions at the national level. *See* 42 U.S.C. § 13389(c)(1); 42 U.S.C. § 17001 *et seq.*

Reflecting the complex tradeoffs inherent in national energy and security policy, the political branches of the U.S. Government have always balanced environmental regulations with economic and social interests. For example, the U.S. Senate unanimously adopted a resolution urging the President not to sign the Kyoto Protocol if it would result in serious harm to the U.S.

---

[1] Congress has revisited the issue of global warming several times. For example, the Global Change Research Act of 1990 established a research program for global climate issues, 15 U.S.C. § 2921, directed the President to establish a research program to "improve understanding of global change," *id.* § 2933, and provided for regular scientific assessments that "analyze[] current trends in global change," *id.* § 2936(3). Congress later directed the Secretary of Energy to conduct assessments related to greenhouse gases and report to Congress. Energy Policy Act of 1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002 (codified at 42 U.S.C. § 13384 *et seq.*).

[2] Indeed, a "national program" addressing greenhouse gas emissions from vehicles "was developed jointly by EPA and the National Highway Traffic Safety Administration." *See* U.S. Env't Prot. Agency, Regulations for Greenhouse Gas Emissions from Passenger Cars and Trucks, http://bit.ly/2EWvcKK.

economy or did not do enough to regulate other countries' emissions. *See* S. Res. 98, 105th Cong. (1997).[3]  More recently, President Trump cited similar economic concerns when he announced his intent to withdraw the U.S. from the Paris Agreement, shortly after which he reaffirmed the importance of fossil fuels to the American economy and the country's dedication to encouraging fossil fuel production. *See* Michael D. Shear, *Trump Will Withdraw U.S. From Paris Climate Agreement*, N.Y. Times (June 1, 2017), http://nyti.ms/2wNImI7; Remarks by President Trump at the Unleashing American Energy Event (June 29, 2017), http://bit.ly/2El7yWU.  And state governments—including New York—recognize the importance of fossil fuels to their citizens and economies, joining the federal government in authorizing and encouraging the production of those fuels within their jurisdictions. *See, e.g.*, 43 C.F.R. § 3162.1; 30 C.F.R. § 745.13(j); *id*. § 550.120; 10 C.F.R. § 626.6; 42 U.S.C. § 6201 *et seq*.; N.Y. Envtl. Conserv. Law § 23-03016 ("declar[ing]" it "to be in the public interest . . . to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be had"); CRR-NY 552.2.

**B.**    **Plaintiff Seeks to Hold Five Energy Producers Solely Liable for Global Warming**

According to Plaintiff, global greenhouse gas emissions "since the dawn of the Industrial Revolution" have contributed to global warming in the form of increased "global average temperature."  FAC ¶¶ 3, 52.  Plaintiff proposes to remedy this worldwide problem by asserting state-law tort claims against a select group of fossil fuel companies*. Id*.  Plaintiff claims Defendants are the "five largest, investor-owned producers of fossil fuels in the world,"[4] and

---

[3] Congress then enacted a series of laws effectively barring EPA from implementing the Protocol in the absence of Senate ratification. *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000).

[4] Plaintiff ignores corporate separateness and improperly aggregates the activities of each Defendant's subsidiaries and affiliates. *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69–70 (2d Cir. 1996).

alleges that they "are collectively responsible, through their production, marketing, and sale of fossil fuels, for over 11% of all the carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the dawn of the Industrial Revolution." *Id.* ¶ 3.  Plaintiff further alleges that Defendants' "marketing" and "promotion" activities prevented effective regulation of emissions and contributed to third-party emissions, and asserts that Defendants "misled the public"—including the worldwide scientific community—by "downplaying the harms and risks of climate change" with the goal of "continu[ing] to produce fossil fuels and sell their products on a massive scale." *Id.* ¶¶ 60, 76–77.

Plaintiff seeks to hold Defendants liable for lawful conduct occurring around the world, including lobbying and other First Amendment-protected activities, but relies solely on state-law claims—public and private nuisance and trespass—for harms that will manifest themselves "in the future." *Id.* ¶¶ 13, 41.  Plaintiff seeks compensatory damages or, alternatively, equitable relief to "abate the nuisance," attorneys' fees, and costs.  *Id.*, Relief Requested.

## II.    LEGAL STANDARD

A complaint is required to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  After stripping away any "legal conclusions" and "conclusory statements," the Court, relying on its "judicial experience and common sense," *id.* at 678–79, must dismiss if the remaining factual allegations fail to "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 545.  Dismissal is also appropriate if the plaintiff's claims are barred as a matter of law, such as where they are displaced or preempted by federal law, *AEP*, 564 U.S. at 423; *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001); infringe on the executive's foreign affairs power, *Garamendi*,

6

539 U.S. at 429; are unconstitutional; or present non-justiciable issues, *767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Rep. of Yugoslavia*, 218 F.3d 152, 164 (2d Cir. 2000).

## III.   ARGUMENT

This is not the first time a plaintiff has tried to plead global-warming-related tort claims. Similar claims have been considered, and dismissed, by the Supreme Court, the Ninth Circuit, and various courts around the country.  *See, e.g.*, *AEP*, 564 U.S. 410; *Kivalina*, 696 F.3d 849; *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849 (S.D. Miss. 2012), *aff'd on other grounds*, 718 F.3d 460 (5th Cir. 2013); *California v. Gen. Motors Corp.*, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007).  Plaintiff's global-warming tort claims likewise suffer from multiple defects that require dismissal of the Amended Complaint with prejudice.

## A.   Plaintiff's Claims Arise Under Federal Common Law and Should Be Dismissed

Plaintiff's Amended Complaint is premised on the theory that New York law should govern tort claims based on global warming caused by the worldwide accumulation of greenhouse gases from billions of emitters over the last several hundred years.  But as the Supreme Court, the Second Circuit, and the Ninth Circuit have squarely held, any such claims aimed at the interstate and international effects of greenhouse gas emissions necessarily arise under *federal* law.  Indeed, a district judge in California recently denied a motion to remand nearly identical claims nominally brought under state law against the same five Defendants, holding that claims addressing "the national and international geophysical phenomenon of global warming . . . are necessarily governed by federal common law."  *People of the State of Cal. v. BP P.L.C.*, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018).[5]

---

[5] Although another California district judge remanded similar global warming claims brought by other cities and counties against fossil fuel producers, it did so based upon its view that any federal common law claims were displaced by statute and that whether state-law claims were preempted was for the state court to decide after remand. *County of San Mateo v. Chevron Corp.*, 2018 WL 1414774, at *1–3 (N.D. Cal. Mar. 16, 2018).  The court agreed,

Under federal common law standards, Plaintiff's Amended Complaint fails to state a claim for relief for at least two separate reasons. First, the federal common law tort claims that Plaintiff asserts have been displaced by the Clean Air Act. Second, even if Congress had not displaced federal common law in this area, dismissal is appropriate because Plaintiff has not pled viable federal common law nuisance or trespass claims.

### 1. Notwithstanding their state-law labels, Plaintiff's claims arise under federal common law

Although "[t]here is no federal general common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), the Court has long recognized that there remain "some limited areas" in which the governing legal rules will be supplied not by state law, but by "what has come to be known as 'federal common law.'" *Tex. Indus. Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). Where "the interstate or international nature of the controversy makes it inappropriate for state law to control," "our federal system does not permit the controversy to be resolved under state law." *Id.* at 641; *see also United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305–06 (1947) ("liability is not a matter to be determined by state law" where "the scope, nature, legal incidents and consequences" of the action "are fundamentally derived from federal sources and governed by federal authority"). Because such controversies implicate "uniquely federal interests," *Tex. Indus.*, 451 U.S. at 640, "the basic scheme of the Constitution . . . demands" that federal common law apply, *AEP*, 564 U.S. at 421. Thus, "if federal common law exists, it is because state law cannot be used." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981) ("*Milwaukee II*").

"The control of interstate pollution" is an area in which federal common law has historically governed. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). For example, the

---

however, that the "claims raise national and perhaps global questions." *Id.* at *3. The *San Mateo* defendants agree that the plaintiffs' federal common law claims are displaced, but they disagree that state law could spring back into life once Congress displaces federal common law remedies.

Supreme Court has held that "regulation of interstate water pollution is a matter of federal, not state, law," and that nuisance claims involving interstate water and air pollution "should be resolved by reference to federal common law."  *Id.* at 488; *see also Illinois v. City of Milwaukee*, 406 U.S. 91, 103 (1972) ("*Milwaukee I*") ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law.").  Courts "develop[ed] federal common law" to resolve issues involving interstate pollution because in this area "there exists a significant conflict" between "federal policy or interest and the use of state law."  *Milwaukee II*, 451 U.S. at 313*; see also Milwaukee I*, 406 U.S. at 105 & n.6 (applying federal common law to interstate pollution claim because of the "overriding federal interest in the need for a uniform rule of decision" and because "the controversy touche[d] basic interests of federalism").  The Court has thus repeatedly "approved federal common-law suits brought by one State to abate pollution emanating from another State."  *AEP*, 564 U.S. at 421.  "[T]he implicit corollary" of these rulings was that, because the nature of the dispute required application of federal standards, "state common law was preempted."  *Ouellette*, 479 U.S. at 488.

The Supreme Court has squarely held that, under this longstanding line of cases, claims asserting global-warming-related injuries from emissions of greenhouse gases—such as the claims asserted by Plaintiff here—are governed by federal common law.  *See AEP*, 564 U.S. at 421–22.  In *AEP*, eight States and various other plaintiffs sued five electric utility companies, contending that "the defendants' carbon-dioxide emissions" had substantially contributed to global warming, thereby "creat[ing] a 'substantial and unreasonable interference with public rights,' in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418.  Like Plaintiff here, the *AEP* plaintiffs "alleged that public lands, infrastructure, and health were at risk from climate change."  *Id*.  To redress their alleged

injuries, the plaintiffs sought injunctive relief capping, and then reducing, the defendants' emissions.  *Id*. at 419.  In reviewing the Second Circuit's decision allowing such claims to proceed, the Supreme Court, as a threshold matter, agreed with the plaintiffs and the Second Circuit that such claims were necessarily governed by federal common law.  *Id*. at 421 ("'When we deal with air and water in their ambient or interstate aspects, there is a federal common law.'" (quoting *Milwaukee I*, 406 U.S. at 103)); *see also Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 392 (2d Cir. 2009) ("hold[ing] that the federal common law of nuisance applies" to global-warming-related tort claim (citing *Milwaukee II*, 451 U.S. at 314 n.7)), *rev'd*, 564 U.S. 410.  In reaching this conclusion, the Supreme Court emphasized that a uniform federal common law standard would have to apply to a global-warming tort claim because, on this subject, "borrowing the law of a particular State would be inappropriate."  *AEP*, 564 U.S. at 422.

In *Kivalina*, a case brought by some of the same private attorneys pleading nearly identical global-warming-related tort claims, the Ninth Circuit followed *AEP* and similarly held that federal common law governed such claims.  696 F.3d at 855–56.  In *Kivalina*, as in this case, a local government entity (an Alaskan city) asserted a public nuisance claim for damages to city property and "critical infrastructure" as a result of "sea levels ris[ing]" and other climatic impacts allegedly resulting from the defendant oil, coal, and electric companies' "emissions of large quantities of greenhouse gases."  *Id*. at 853–54.  The city asserted this public nuisance claim under federal common law and, in the alternative, under state law.  *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849.  The Ninth Circuit, following *AEP*, began "by addressing first" the parties' "threshold" disagreement as to whether the plaintiff's claims arose under federal common law.  696 F.3d at 855.  The Court held that, under *AEP*, a global-warming tort suit like the plaintiff's was the sort of "transboundary

10

pollution suit[]" to which federal common law applied.  *Id*. at 855–58.[6]

Under *AEP*, Plaintiff's claims (to the extent they exist at all) are plainly governed by federal common law.  *See AEP*, 564 U.S. at 421–22; *AEP*, 582 F.3d at 855–56.  Plaintiff's claims are based on Defendants' alleged worldwide fossil fuel production and the worldwide emissions of countless nonparties, and not on any conduct occurring exclusively, or even primarily, in New York.  *See* FAC ¶ 3.  The sheer scope of these claims, and the conduct on which they are based, demonstrate the "overriding federal interest in the need for a uniform rule of decision." *Milwaukee I*, 406 U.S. at 105 n.6; *see also AEP*, 564 U.S. at 422; *BP*, 2018 WL 1064293, at *3 ("[T]he transboundary problem of global warming raises exactly the sort of federal interests that necessitate a uniform solution.").  Thus, notwithstanding the state-law label Plaintiff puts on its claims, "the scope of the worldwide predicament" at issue in this case "demands the most comprehensive view available, which in our American court system means our federal courts and our federal common law."  *BP*, 2018 WL 1064293 at *3.

The inherently federal nature of Plaintiff's global-warming tort claims is not altered by the fact that Congress, in enacting the Clean Act Act, displaced federal common law remedies in favor of a comprehensive federal regulatory scheme that provides a limited role for state-law tort remedies.  *See AEP*, 564 U.S. at 429; *Ouellette*, 479 U.S. at 496–97 (addressing comparable effect of enactment of the Clean Water Act).  Under the Clean Air Act, the range of tort claims that can be asserted under state law is quite narrow, and Plaintiff's claims do not fall within it. Within a scheme established by Congress to address sources of interstate pollution, state

---

[6] The plaintiffs in *Kivalina* and *AEP* had alternatively asserted state-law claims, but those alternative claims were not before the courts on appeal.  *See Kivalina*, 696 F.3d at 855; *AEP*, 564 U.S. at 429.  However, in view of those courts' holdings that federal common law governed the sort of inherently interstate and international tort claims associated with global warming, and that application of a particular State's law to such claims would be "inappropriate," *AEP*, 564 U.S. at 422, it is not surprising that, following the dismissal of their federal claims, the plaintiffs on remand in both cases did not attempt to pursue any such alternative theory that state law could be applied.

common law can be applied to further limit a defendant's emissions *only within that source state*, if at all; the existence of the federal statute "precludes a court from applying the law of an affected State against an out-of-state source." *Ouellette*, 479 U.S. at 492–94.  Because Plaintiff's claims rely on an analysis of *global* emissions for out-of-state sources in every State and country around the world, those claims cannot be governed by the law of New York.  *See id.* at 496 (rejecting application of state law to out-of-state sources because it would result in "a variety of" "'vague' and 'indeterminate'" state common law "nuisance standards" and "[t]he application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty"); *AEP*, 564 U.S. at 422 (application of a particular State's law would be "inappropriate"); *BP*, 2018 WL 1064293, at *3 ("A patchwork of fifty different answers to the same fundamental global issue would be unworkable.").  To the extent any such global-warming tort remedy exists, it must be grounded in *federal* law, as the Supreme Court, Second Circuit, and Ninth Circuit have all held.

## 2. Congress has displaced federal common law governing global warming-based tort claims

Although global warming claims necessarily arise under federal common law, *AEP* and *Kivalina* both held that any such cause of action fails to state a claim because Congress has displaced those federal tort remedies by failing to include them in the regulatory scheme established in the Clean Air Act.  *AEP*, 564 U.S. at 423–29; *Kivalina*, 696 F.3d at 856–58. Plaintiff's claims fail for the same reason.

"[T]he right to assert a federal common law public nuisance claim has limits."  *Kivalina*, 696 F.3d at 856.  "Federal common law is a necessary expedient, and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."  *Milwaukee II*, 451 U.S. at 314; *see also id.* at 317 ("[W]e start with the assumption that it is for Congress, not federal courts, to

articulate the appropriate standards to be applied as a matter of federal law."); *In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981) (recognizing "presumption in favor of preemption of federal common law whenever it can be said that Congress has legislated on the subject"). Accordingly, "federal common law does not provide a remedy" "when federal statutes directly answer the federal question." *Kivalina*, 696 F.3d at 856.

"The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speak[s] directly to [the] question at issue." *AEP*, 564 U.S. at 424. In *AEP*, the Supreme Court recognized that Congress has spoken directly to greenhouse gas emissions because they "qualify as air pollution subject to regulation under the [Clean Air] Act." *Id.* (citing *Massachusetts v. EPA*, 549 U.S. 497, 528–29 (2007)). The Court thus held that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." *Id.* at 424; *see also Kivalina*, 696 F.3d at 857; *Weiler v. Chatham Forest Prods., Inc.*, 392 F.3d 532, 534 (2d Cir. 2004) (recognizing that "[t]he Clean Air Act created a complex and comprehensive legislative scheme" (citation omitted)).

Here, Plaintiff's claims have likewise been displaced. Indeed, counsel for Plaintiff, in a California case asserting nearly identical claims against the same Defendants sued here, admitted as much, conceding that federal common law claims based on alleged global-warming-related injuries have been displaced. *See California v. BP P.L.C., et al.*, No. 17-cv-6011, ECF No. 81 at 8, 10 (N.D. Cal. Nov. 20, 2017); *id.*, ECF No. 108 at 2 ("[T]he Clean Air Act displaces the federal common law of interstate pollution.").[7]

---

[7] Despite the plaintiffs' admission, the court in *BP* stated that plaintiffs' claims were not completely displaced because rather than suing emitters, they brought "claims against defendants for having put fossil fuels into the flow of international commerce." *BP*, 2018 WL 1064293, at *4. The court also stated that the claims were not displaced because some of the fossil fuels produced by defendants were combusted overseas, and foreign emissions are "out of

Attempting to distinguish its claims from those dismissed in *AEP* and *Kivalina*, Plaintiff disclaims any attempt "to impose liability on Defendants for their direct emissions of greenhouse gases," FAC ¶ 14, and asserts that its nuisance and trespass claims are predicated solely on Defendants' extraction and marketing activities, *id.* ¶¶ 133, 140, 148.  But just as in *AEP* and *Kivalina*, Plaintiff alleges injuries that it claims were caused by excessive worldwide *emissions*, and that is sufficient to warrant application of federal common law—which has then been displaced by the Clean Air Act.  *Id.* ¶¶ 52, 54–55.[8]  The fact that Plaintiff's claims rest on a *derivative* theory of liability for causing *other persons'* allegedly unreasonable and excessive emissions does not distinguish the analysis in *AEP* or *Kivalina*.  Indeed, in *Kivalina*, the Ninth Circuit expressly held that the plaintiff's derivative theory of indirect liability—based on allegations that defendants had "conspir[ed] to mislead the public about the science of global warming"—was "dependent upon the success" of the underlying public nuisance claim, and therefore both claims were equally governed by federal common law and were equally displaced.  696 F.3d at 854, 858.  Applying *Kivalina* and *AEP* to global warming claims similar to those at issue here, the *San Mateo* court held that "*Kivalina* stands for the proposition that federal common law is not just displaced when it comes to claims against domestic sources of emissions but also when it comes to claims against energy producers' contributions to global warming and

---

the EPA and Clean Air Act's reach."  *Id.*  However, the displacement issue was not fully briefed in the remand proceedings, and was not briefed by defendants at all.  The defendants in *BP* now have filed a motion to dismiss arguing that the logic behind *AEP* and *Kivalina* requires displacement of, at the least, the plaintiffs' claims based on domestic emissions and that insofar as those claims implicate foreign emissions, they must be dismissed in any event because federal common law principles do not support recognition of a cause of action based on emissions made outside the United States and cause injury only when combined with all similar emissions worldwide.  *BP*, No. 17-cv-06011, ECF No. 159 at 9–11 (Mar. 20, 2018).  That motion is currently pending.

[8] *See also* FAC ¶ 54 (discussing temperature increases from "emissions scenarios"); *id.* ¶ 64 (discussing "global warming-induced sea level rise caused by past fossil fuel consumption," "[t]emperature increases from GHG emissions," and the "impacts" of "past and continuing GHG pollution"); *id.* ¶ 69 ("the burning of fossil fuels" is "causing . . . changes to the climate").

rising sea levels.  Put another way, [*AEP*] did not confine its holding about the displacement of federal common law to particular sources of emissions, and *Kivalina* did not apply [*AEP*] in such a limited way."  *San Mateo*, 2018 WL 1414774, at *1.

The incompatibility of Plaintiff's nuisance claim with the Clean Air Act is highlighted by the fact that Plaintiff would have to prove, *inter alia*, that the greenhouse gas emissions for which it seeks to hold Defendants responsible created an "*unreasonable* interference with a right common to the general public."  *Milwaukee II*, 451 U.S. at 348 (emphasis added); *Copart Indus., Inc. v. Consol. Edison Co. of N.Y., Inc.*, 41 N.Y.2d 564, 570 (1977) (plaintiff must prove that interference is "unreasonable in character").  "[A]djudication of Plaintiff's claim" would thus "require the Court to balance the competing interests of reducing global warming emissions and the interests of advancing and preserving economic and industrial development" dependent on fossil fuels.  *Gen. Motors*, 2007 WL 2726871, at *8, 15.  But that determination "ha[s] been entrusted by Congress to the EPA."  *Comer*, 839 F. Supp. 2d at 865 (citing *AEP*, 564 U.S. at 428).  Accordingly, "[t]he judgments the [Plaintiff] would commit" to this court "cannot be reconciled with the decisionmaking scheme Congress enacted."  *AEP*, 564 U.S. at 429.

Because Congress has "designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions," *AEP*, 564 U.S. at 428, Plaintiff's concerns "must rest in the hands of the legislative and executive branches of our government, not the federal common law," *Kivalina*, 696 F.3d at 858.  The Amended Complaint should be dismissed because Congress has displaced the federal common law that governs Plaintiff's claims.

### 3.  Alternatively, Plaintiff has failed to plead a viable federal common law claim

Alternatively, even if Congress had not displaced the relevant federal common law, Plaintiff has failed to state a claim that complies with federal common law standards.  Federal common law has never been extended to the sort of expansive derivative theory of liability

asserted by Plaintiff here.  There is no precedent for applying tort liability against producers of lawful products at lawful levels merely because consumers happen to create pollution while *using* those products.  *See AEP*, 564 U.S. at 422 ("Nor have we ever held that a State may sue to abate any and all manner of pollution originating outside its borders.").  Nor do federal proximate causation principles support the imposition of liability where, as here, the causal chain between lawful production and the alleged harm involves billions of intervening causes and complex ecological phenomena dating back to the "Industrial Revolution."[9]  *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235–36, 240 (2d Cir. 1999) (dismissing claims and noting that proximate cause requires "chain of causation leading to damages [that] is not complicated by the intervening agency of third parties").  As Plaintiff's counsel recently admitted in parallel California proceedings, "[a]pplying federal common law to producer-based cases would extend the scope of federal nuisance law well beyond its original justification." *BP*, No. 17-cv-06011, ECF No. 81 at 9.[10]  There is no justification for extending the federal common law of nuisance beyond the "bounded pollution giving rise to past federal nuisance suits." *AEP*, 564 U.S. at 422.[11]

## B.    Plaintiff's Claims Are Independently Barred by Numerous Federal Doctrines

Regardless whether Plaintiff's claims arise under federal or state law, dismissal is warranted because adjudication of these claims would interfere with the foreign affairs powers of

---

[9] *See infra* Sections III.C.2 & III.D.2 for discussion of Plaintiff's failure to adequately plead causation or injury-in-fact.

[10] To the extent that Plaintiff's claims are predicated on harms caused by "greenhouse gases emanating from overseas sources," *BP*, 2018 WL 1064293, at *4, the claims should be dismissed because federal common law has never provided a remedy for harms caused by foreign polluters, and the Supreme Court has cautioned against recognizing novel causes of action under federal common law.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 726–28 (2004).

[11] While the Second Circuit held that non-state parties could bring federal common law nuisance claims, *AEP*, 582 F.3d at 359–66, the Supreme Court has indicated that they cannot.  *See Milwaukee I*, 406 U.S. at 105 n.6; *New Jersey v. New York*, 345 U.S. 369, 372–73 (1953).  And in any event, federal common law does not create "a cause of action . . . by a private plaintiff, seeking damages," and so Plaintiff's damages remedy is improper.  *Middlesex Cty.. Sewage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 21 (1981).

the political branches; the relief Plaintiff seeks would violate the Commerce, Due Process, and

Takings Clauses; and the claims are preempted by federal law.

### 1.   Plaintiff's claims infringe on the federal foreign affairs power

The Supreme Court has held that "state laws 'must give way if they impair the effective

exercise of the Nation's foreign policy.'" *Garamendi*, 539 U.S. at 419 (citation omitted).  In

addition to invalidating state statutes, the foreign affairs doctrine bars state-law causes of action.

*See In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 115, 119–20 (2d Cir. 2010).  Plaintiff's

claims undermine the federal government's foreign affairs powers because they would impair the

government's ability to negotiate and implement comprehensive international frameworks on

global warming and would require judicial second-guessing of global warming policies adopted

by the federal government in negotiating with foreign sovereigns.

In addition to federal legislation and regulation, greenhouse gas emissions and responses

to global warming are the subject of international agreements.  *See supra* Section I.A; *see also*

*Gen. Motors*, 2007 WL 2726871, at *14 ("[T]he political branches have . . .  made foreign policy

determinations regarding the United States' role in the international concern about global

warming.").  The United States has clearly stated its policy to seek multilateral reductions in

worldwide carbon emissions, and has used domestic emissions reductions as a bargaining chip to

extract similar commitments from other nations in negotiations.  *See supra* Section I.A.  Most

recently, President Trump announced his intent to withdraw from the Paris Agreement for,

among other reasons, what he determined to be its unfair impact on the American economy.[12]

*See id*.  Plaintiff, apparently dissatisfied by these developments, is attempting to "employ[] a

---

[12] Underscoring the need for a uniform approach, President Trump also noted the Paris Agreement continues to be evaluated, and that the government's focus is on negotiating a "good deal for the U.S."  Graham Ruddick, *Donald Trump says US could re-enter Paris climate deal*, The Guardian (Jan. 28, 2018), http://bit.ly/2niJFsW.

different, state system of economic pressure" on the fossil fuel industry.  *Garamendi*, 539 U.S. at

423 (citation omitted).  But "by seeking to impose damages for the [Defendants'] lawful

worldwide [fossil fuel extraction], Plaintiff's nuisance claims sufficiently implicate the political

branches' powers over . . . foreign policy."  *Gen. Motors*, 2007 WL 2726871, at *14.

Although Plaintiff suggests it has no intention of "restrain[ing] Defendants from

engaging in their business operations," FAC ¶ 14, it requests relief designed to pressure

Defendants to curtail their business operations around the world.[13]  *See Kurns v. R.R. Friction

Prods. Corp.*, 565 U.S. 625, 637 (2012) ("[S]tate regulation can be . . . effectively exerted

through an award of damages, and the obligation to pay compensation can be, indeed is designed

to be, a potent method of governing conduct and controlling policy."); *see also San Diego Bldg.

Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).  Plaintiff's claims, which are based on

Defendants' worldwide activities, would thus "undercut[] the President's diplomatic discretion

and the choice he has made exercising it."  *Garamendi*, 539 U.S. at 423–24.

In *Crosby v. National Foreign Trade Council*, for example, Massachusetts passed a law

barring state entities from transacting with companies doing business in Burma—an effort to

spur that country to improve its human rights record.  530 U.S. 363, 366–70 (2000).  But because

the law "undermine[d] the President's capacity . . . for effective diplomacy" by "compromis[ing]

the very capacity of the President to speak for the Nation," the Supreme Court struck it down.

*Id.* at 381.  As the Court explained, "the President's maximum power to persuade rests on his

capacity to bargain for the benefits of access to the entire national economy without exception

for enclaves fenced off willy-nilly by inconsistent political tactics."  *Id.*  In other words, "the

---

[13] Indeed, Mayor de Blasio publicly declared his intention to use this lawsuit and the City's "litigation power to go at these bad actors" by seeking "billions" of dollars in damages, and that his intention was to "help bring the death knell to this industry."  *Transcript: Mayor de Blasio Appears Live On The Bernie Show With Senator Bernie Sanders* (Jan. 25, 2018), http://on.nyc.gov/2F14B1k.

President's effective voice" on matters of foreign affairs must not "be obscured by state or local action."  *Id.*  Likewise, in *Garamendi* the Court invalidated California's effort to encourage Holocaust reparations by European insurance carriers based on "the likelihood that state legislation will produce . . . more than incidental effect in conflict with express foreign policy of the National Government."  539 U.S. at 420.  "Quite simply," the Court explained, "if the California law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence."  *Id.* at 424 (alterations omitted).

Because recognizing a "global warming nuisance tort would have an inextricable effect on . . . foreign policy" that conflicts with the federal government's objectives, Plaintiff's claims should be dismissed.  *Gen. Motors*, 2007 WL 2726871, at *14.[14]

### 2.   Plaintiff's claims are barred by the Commerce Clause

Plaintiff's claims, which are based on production and promotion activities around the world, should be dismissed because they seek to regulate out-of-state commercial activities. "The critical inquiry" in determining whether state regulation violates the Commerce Clause "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).  This requires courts to "consider[] how [the regulation] may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. . . .  [T]he Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."  *Id.* at 336–37.  Nor may a state

---

[14] Similarly, the act-of-state doctrine supports dismissal because the challenged conduct is often undertaken pursuant to acts of foreign governments (e.g., granting extraction licenses and leasing state-owned land), and thus adjudicating Plaintiff's claims would "embarrass the Executive Branch or our Government in the conduct of our foreign relations."  *Alfred Dunhill of London, Inc. v. Rep. of Cuba*, 425 U.S. 682, 697 (1976); *see also Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 955 (5th Cir. 2011).

use its tort law to "impos[e] its regulatory policies on the entire nation," because "one State's power to impose burdens on the interstate market" is "constrained by the need to respect the interests of other States." *BMW of N. Am. v. Gore*, 517 U.S. 559, 571, 585 (1996).

Plaintiff requests, *inter alia*, an injunction to "abate the nuisance" in New York that Defendants allegedly caused when they "produced, marketed, and sold massive quantities of fossil fuels" around the world. FAC ¶¶ 1, 3, 13, 76. As such, Plaintiff's requested injunction would necessarily regulate Defendants' out-of-state conduct. Indeed, Plaintiff's allegations are expressly based on Defendants' out-of-state fossil fuel production, a tiny fraction of which was allegedly "delivered, marketed, and sold to New York State residents for use," and on national promotion activities. *Id.* ¶ 25; *see also id.* ¶ 29 (BP, production in TX), ¶ 30 (Chevron, production in MS), ¶ 31 (ConocoPhillips, production in ND, NJ, PA, TX, and LA), ¶ 36 (Exxon, production in LA, TX, ND, and NJ), ¶ 40 (Shell, production in TX and LA).

Moreover, exercises of state power burdening foreign commerce—as Plaintiff's injunction here would—are held to an even stricter standard under the Commerce Clause than those burdening only interstate commerce. *See, e.g.*, *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311 (1994) ("In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." (internal citations omitted)); *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984) ("It is a well-accepted rule that state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny."). For this reason, too, the Amended Complaint must be dismissed.

Plaintiff's request for monetary damages would have the same practical effect, singling out these five investor-owned companies to their detriment in a global fossil fuel industry that is otherwise largely state-owned and thus less easily subject to suit. It is well-recognized that

20

"[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Bldg. Trades*, 359 U.S. at 247; *see also BMW*, 517 U.S. at 572 n.17 ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute."). After all, if Defendants' lawful business models are deemed a nuisance, every day of continued existence would give rise to a new nuisance claim, and therefore perpetual liability, until the business model terminates. *See Town of Oyster Bay v. Lizza Indus., Inc.*, 22 N.Y.3d 1024, 1031 (2013) (explaining continuing nuisance liability). The Supreme Court has recognized that common-law environmental tort claims in particular can force a defendant to "change its methods of doing business and controlling pollution to avoid the threat of ongoing liability," and that courts theoretically could "require the source to cease operations by ordering immediate abatement." *Ouellette*, 479 U.S. at 495. In short, whether this Court were to impose an injunction or award damages, Plaintiff's requested relief would "directly control" commerce occurring wholly outside New York in violation of the Commerce Clause. *Healy*, 491 U.S. at 336; *see also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994) ("Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce.").

Furthermore, courts must consider how one State's regulations "may interact with the legitimate regulatory regimes of other States," *Healy*, 491 U.S. at 336, and imposing penalties "based in large part on conduct that happened in other jurisdictions" would "infring[e] on the policy choices of other States," *BMW*, 517 U.S. at 572–73. Many states depend on the extraction of petroleum resources for energy and economic security,[15] and New York may not "impose its own policy choice on neighboring states," let alone every state in the country. *Id.* at 571.

---

[15] As just one example, Wyoming is considering policies to *increase* production within the State. Heather Richards, *Lawmakers propose tax cut for oil and gas in Wyoming*, Casper Star Tribune (Feb. 14, 2018), http://bit.ly/2FfEm4V.

### 3.   Plaintiff's claims are barred by the Due Process and Takings Clauses

Plaintiff does not allege that Defendants have violated *any* of the numerous federal and state laws regulating the extraction, production, promotion, or sale of fossil fuels.  Yet it nevertheless seeks "billions" of dollars in damages based on Defendants' lawful economic activity and constitutionally protected lobbying activities across the country over the course of several decades.  *See* FAC ¶¶ 3, 11, 12, 84, 127 & Relief Requested.[16]  Imposing this type of massive extraterritorial and retroactive liability would constitute "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).[17]

Due process forbids States from "punish[ing] a defendant for conduct that may have been lawful where it occurred."  *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003) (collecting cases).  Indeed, "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States."  *BMW*, 517 U.S. at 572–73 & n.19; *see also id.* at 573 (holding that state could not "punish BMW for conduct that was lawful where it occurred" or "impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions").

Similarly, due process prohibits states from imposing retroactive liability for lawful conduct.  In *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the Court invalidated a federal statute that made coal companies retroactively liable for the medical costs of former coal miners.  Justice O'Connor, writing for a four-justice plurality, observed that the Coal Act was

---

[16] Under the *Noerr-Pennington* doctrine, lobbying activities fall squarely within the protections of the First Amendment.  *See EDF Renewable Dev. Inc.* v. *Tritec Real Estate Co., Inc.*, 147 F. Supp. 3d 63, 68 (E.D.N.Y. 2015).  No civil liability can arise from such constitutionally-protected activities.  *See, e.g., Gen-Probe, Inc.* v. *Amoco Corp., Inc.*, 926 F. Supp. 948, 956 (S.D. Cal. 1996) (holding that "*Noerr* immunity bars any claim, federal or state, common law or statutory, that has as its gravamen constitutionally-protected petitioning activity").

[17] Indeed, some Defendants undertook their production and promotion activities on behalf of the federal government, and so are protected by the government contractor defense.  *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 87–101 (2d Cir. 2008).

unconstitutional under the Takings Clause because it "divest[ed] Eastern of property long after

the company believed its liabilities . . . to have been settled[,] [a]nd the extent of Eastern's

retroactive liability is substantial and particularly far reaching." *Id.* at 534.  The plurality struck

down the Act because it "improperly place[d] a severe, disproportionate, and extremely

retroactive burden on Eastern." *Id.* at 538; *see also id.* at 539, 549 (Kennedy, J., concurring in

the judgment and dissenting in part) (statute "must be invalidated as contrary to essential due

process principles" because it created "liability for events which occurred 35 years ago" and had

"a retroactive effect of unprecedented scope").[18]

These principles prohibit tort claims like the ones at issue here, which seek to impose

massive extraterritorial and retroactive liability based on Defendants' lawful conduct over

hundreds of years.  *See* FAC ¶ 76.

### 4.  Plaintiff's claims are preempted by federal law

State-law tort claims are preempted when they conflict with federal law or where

Congress has occupied the field through legislation.  *See Buckman*, 531 U.S. at 348; *N.Y. SMSA*

*Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) ("[C]onflict preemption

[exists] where . . . the local law is an obstacle to the achievement of federal objectives.");

*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313–14 (2d Cir. 2005).  In addition, state-law tort

claims are preempted where they implicate "'uniquely federal interests'" that are "committed by

the Constitution and laws of the United States to federal control."  *Boyle v. United Tech. Corp.*,

---

[18] Courts have held that *Eastern Enterprises* "stands for a clear principle: a liability that is severely retroactive, disruptive of settled expectations and wholly divorced from a party's experience may not constitutionally be imposed." *Me. Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 378 (1999); *see also Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters*, 61 F. Supp. 2d 740, 743 (S.D. Ohio 1999).  In *United States v. Alcan Aluminum Corp.*, the Second Circuit observed that "no 'common denominator' [could] be said to exist among the Court's opinions."  315 F.3d 179, 189 (2d Cir. 2003).  But the constitutional principles underlying those decisions are binding, and other Second Circuit decisions have embraced them.  *See Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 192 (2d Cir. 2014) (asking whether a challenged statute "impose[d] severe retroactive liability on a limited class of parties that could not have anticipated the liability"); *Sweet v. Sheahan*, 235 F.3d 80, 88–89 (2d Cir. 2000).

487 U.S. 500, 504 (1988) (citations omitted).  Plaintiff's claims here are preempted for all three reasons.

First, as set forth above, *supra* Sections III.A–B.2, the claims run headlong into environmental, energy, national security, and foreign relations issues that are subject to federal control, and thus cannot proceed.  *See also Garamendi*, 539 U.S. at 418–19.

Second, by enacting the Clean Air Act, "Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants," thus occupying the field. *AEP*, 564 U.S. at 427 (noting that 42 U.S.C. § 7411(b)(1)(A) directs EPA to establish emissions standards for categories of stationary sources that, "caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare").

Third, any state-law damages award here would necessarily be premised on a finding that Defendants' production and promotion of energy resources led to an "unreasonable" level of emissions, and that Defendants engaged in these activities without justification or permission. But "Congress has entrusted the [EPA] with the responsibility for making these scientific judgments, and [this Court] must respect both Congress' decision and the Agency's ability to rely on the expertise that it develops."  *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1146 (D.C. Cir. 1980).  A judicial determination of "reasonableness" would directly conflict with the EPA's regulatory decisions, and the Supreme Court has "admonished against the 'tolerat[ion]' of 'common-law suits that have the potential to undermine [the federal] regulatory structure.'" *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 303 (4th Cir. 2010) (quoting *Ouellette*, 479 U.S. at 497).[19]  Plaintiff's proposed solution to the important issue of global

---

[19] As noted in *Cooper*, the Supreme Court has "singled out nuisance standards in particular as 'vague' and 'indeter-minate,'" and "created the strongest cautionary presumption against them" due to the "considerable potential mis-chief in those nuisance actions seeking to establish emissions standards different from federal and state regulatory law[.]"  *Cooper*, 615 F.3d at 303 (quoting *Ouellette*, 479 U.S. at 496).

warming—an avalanche of litigation based on overlapping application of every State's common law—presents a significant obstacle to the federal regulation of air pollution because it would impose standards "whose content must await the uncertain twists and turns of litigation," which "will leave whole states and industries at sea and potentially expose them to a welter of conflicting court orders across the country."  *Id.* at 301.  Such a reality "could well lead to increased air pollution," and "'[i]t is unlikely—to say the least—that Congress intended to establish such a chaotic regulatory structure.'"  *Id.* at 302 (quoting *Ouellette*, 479 U.S. at 497).

Moreover, Plaintiff's claims, which target Defendants' production activities, are preempted by the numerous federal laws and regulations that authorize and affirmatively promote fossil fuel production.  *See Xerox Corp. v. Harris Cty., Tex.*, 459 U.S. 145, 151, 154 (1982) (holding that state taxes on goods stored in customs warehouses were preempted because statutory scheme sought "to encourage merchants here and abroad to make use of American ports").  The U.S. has long sought to promote fossil fuel production on federal land.  *See, e.g.*, 43 U.S.C. § 1802(1) (promoting the "expedited exploration and development of the [Outer Continental Shelf] in order to achieve national economic and energy policy goals [and] assure national security"); 10 U.S.C. § 7422(c)(1)(B); 30 U.S.C. § 201(a)(3)(C).  Consistent with these statutory objectives, the Bureau of Land Management requires federal oil and gas lessees to drill "in a manner which . . . results in maximum ultimate economic recovery of oil and gas."  43 C.F.R. § 3162.1(a); *see also* 30 C.F.R. § 550.120 (similar for offshore oil and gas leases).

Plaintiff's claims also second-guess the balance that many of these same federal statutes strike between promoting energy production and protecting the environment.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (tort claims preempted where they "would have presented an obstacle to the variety and mix of devices that the federal regulation sought"); *see*

*also* S. Rep. No. 109-78 (promoting domestic energy production in "an environmentally sound manner"); 42 U.S.C. § 13389(c)(1) (incentivizing energy production along with development of a "national strategy" to deploy "greenhouse gas intensity reducing technologies and practices").[20]

**C.    The Amended Complaint Does Not Allege Viable State-Law Claims**

Plaintiff asks this Court to significantly expand New York nuisance and trespass law, but New York courts have consistently refused to recognize claims as attenuated as these.

### 1.   Plaintiff's claims have no basis in New York nuisance or trespass law

New York courts are "cautious in imposing novel theories of tort liability," especially when those duties remain "the focus of a national policy debate" and subject to comprehensive regulatory schemes. *Hamilton*, 96 N.Y.2d at 239–40 (declining to create a general duty of care for handgun manufacturers because "[f]ederal law already has implemented a statutory and regulatory scheme").[21] And they are particularly "wary of expanding the breadth of public nuisance" or trespass liability, *City of New York v. A.E. Sales LLC*, 2005 WL 3782442, at \*3 (S.D.N.Y. Feb. 9, 2005), because nuisance and "trespass claims for environmental pollution" "endeavor to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned," *In re Paulsboro Derailment Cases*, 2013 WL 5530046, at \*8 (D.N.J. Oct. 4, 2013). New York courts have thus safeguarded the limits of public nuisance and other torts, lest they "become a monster that would devour in one gulp the entire law of tort." *Sturm, Ruger*, 761 N.Y.S.2d at 196–97, 202–03.

---

[20] A host of other statutes articulate similar policies. *E.g.*, 42 U.S.C. § 5801 (Congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while protecting "environmental quality"); 30 U.S.C. § 21a (Congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); 30 U.S.C. § 1201 (coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

[21] *Cf., Sturm, Ruger*, 761 N.Y.S.2d at 230 (no liability where issues raised in complaint were "subject of strict control and regulation by the Executive and Legislative branches of both the United States and New York State"); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1119–21 (Ill. 2004) ("there are strong public policy reasons to defer to the legislature in the matter of regulating the manufacture, distribution, and sale of firearms").

Plaintiff's claims, which seek to punish Defendants' lawful, regulated commercial activity, disregard the boundaries New York courts have drawn for nuisance and trespass claims and would disrupt comprehensive state and federal regulatory schemes and generate an "outpouring" and "explosion of litigation." *Sturm, Ruger*, 761 N.Y.S.2d at 202–03; *see also Sahu v. Union Carbide Corp.*, 2014 WL 3765556, at *6 (S.D.N.Y. July 30, 2014) (Keenan, J.) ("[O]rdinarily nuisance is an action pursued against the owner of land for some wrongful activity conducted thereon."); *In re Nassau Cty. Consol. MTBE (Methyl Tertiary Butyl Ether) Prod. Liab. Litig.*, 918 N.Y.S.2d 399 (Sup. Ct. 2010) (trespass claim dismissed "where it is only alleged that [defendants] committed a trespass by their participation in the chain of distribution").  New York law should not be expanded here.

### 2. Plaintiff fails to plausibly demonstrate that Defendants proximately caused the alleged injuries

New York courts require spatial and temporal proximity between conduct and harm to ensure that a "direct and immediate" connection exists between the defendant's conduct and alleged harm. *Sturm, Ruger*, 761 N.Y.S.2d at 197; *Smith v. 2328 Univ. Ave. Corp.*, 859 N.Y.S.2d 71, 73–74 (1st Dep't 2008) (rejecting product liability claim where product was not defective when sold, the alleged harm arose 50 years after sale, and there were numerous actors intervening) (citing *Sturm, Ruger*, 761 N.Y.S.2d at 201).  And courts have consistently refused to "lay aside traditional notions of remoteness, proximate cause, and duty," in particular with nuisance and trespass claims.  *See Janki Bai Sahu v. Union Carbide Corp.*, 528 F. App'x 96, 101 (2d Cir. 2013) (citing *Sturm, Ruger*, 761 N.Y.S.2d at 199, 200–02); *In re Nassau Cty.*, 918 N.Y.S.2d 399 (proximate cause standard is the same for nuisance and trespass).

For this reason, New York courts have dismissed claims like these, where the allegations involve spatial and temporal distance (not to mention intervening third parties) between

Defendants' actions and the alleged harm.  In *Sturm, Ruger*, for example, the New York

Attorney General alleged that defendant handgun manufacturers were liable for a public nuisance

through product promotion and sales, by which they "knowingly place[d] a disproportionate

number of handguns in the possession of people who use them unlawfully."  761 N.Y.S.2d at

194 (citing *Hamilton*, 96 N.Y.2d 222).  The court rejected the Attorney General's claims because

the harm was "*far too remote* from defendants' *otherwise lawful commercial activity* to fairly

hold defendants accountable for common-law public nuisance." *Id.* at 201 (emphasis added).

Thus, as a matter of law, the defendants' conduct could "not be considered a proximate cause of

such harm." *Id.*; *see also In re Nassau Cty.*, 918 N.Y.S.2d 399 at *18 (dismissing where

defendants merely "participat[ed] in the chain of distribution of MTBE-containing gasoline");

*Town of Islip v. Datre*, 245 F. Supp. 3d 397, 428–29 (E.D.N.Y. 2017) (dismissing trespass claims

against defendants who did not "directly dispose[] of hazardous material," but rather only "acted

as brokers" and "facilitated the dumping").  Similarly, this Court has rejected claims based on

the production and distribution of a product on proximate cause grounds.  *See Union Carbide

Corp.*, 2014 WL 3765556, at *11 ("[I]t is equally obvious that the process of manufacturing

chemicals produces waste.  But it does not necessarily follow that the production of chemicals

itself constitutes legal causation of a tort." (citing *Sturm, Ruger*, 761 N.Y.S.2d at 202)).[22]

Here, too, Plaintiff's allegations on their face fail to satisfy New York's causation

requirements.  Plaintiff acknowledges that "the burning of fossil fuels is the dominant cause" of

---

[22] Other jurisdictions have also rejected public nuisance actions against product manufacturers, relying on the same remoteness analysis. *E.g.*, *Camden Cty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 541 (3d Cir. 2001) (rejecting public nuisance claim against handgun manufacturers because the "causal chain" from manufacturers making "lawful sales to federally licensed gun distributors, who in turn lawfully sell those handguns to federally licensed dealers" is "simply too attenuated" (quoting *Hamilton*, 96 N.Y.2d at 234)); *City of Chicago v. Am. Cyanamid Co.*, 355 Ill. App. 3d 209, 225 (2005) (rejecting nuisance claim against lead pigment manufacturers); *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 355 (2001) ("[T]here are numerous steps between the conduct of the various defendants and the harms suffered by the plaintiffs.  That fact alone is strongly suggestive of remoteness.").

global warming, FAC ¶ 52, but nonetheless seeks to hold Defendants liable based solely on their

"production, marketing, and sale of fossil fuels," *id.* ¶ 3.  Moreover, Plaintiff attempts to impose

massive liability based on a theory of indirect liability for emissions from untold numbers of

third parties, notwithstanding the fact that "[g]reenhouse gas molecules cannot be traced to their

source, and greenhouse gases quickly diffuse and commingle in the atmosphere." *Id.* ¶ 58.  And

Plaintiff alleges that the greenhouse gas emissions indirectly attributable to Defendants' lawful

conduct, along with the emissions from every other industrial and non-industrial source on Earth,

combine in such a way as to cause "dramatic impacts on New York City in the future." *Id.* ¶ 41.

Such allegations, which depend on the use of lawful products by untold numbers of third

parties—including Plaintiff itself—over several centuries, are far more remote and attenuated

than allegations already rejected by New York courts.  *See Sturm, Ruger*, 761 N.Y.S.2d at 202.

And even if Plaintiff's allegations were sufficient to plead causation by the collective actions of

all Defendants—and they are not—they are woefully insufficient to plead causation by each of

the Defendants individually.  *See, e.g.*, *Beauchamp v. Excelsior Brick Co. of Haverstraw*, 127

N.Y.S. 686 (2d Dep't 1911) (recognizing that it is "necessary . . . to consider separately as to

each defendant" their "participation, if any" in the "alleged causes" of a claimed nuisance); *see

also* Mem. of Law in Support of ConocoPhillips' Motion to Dismiss.[23]

### 3.  Plaintiff does not adequately plead lack of justification or permission

Plaintiff's trespass claim also fails because it has not sufficiently alleged that Defendants'

---

[23] Nor does Plaintiff allege facts going to the "bedrock principle of tort law" that the "defendant's act was a cause-in-fact of [the] injury." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 179 (2d Cir. 2013).  The defendant's "conduct is not a substantial factor in bringing about harm to another if it would have been sustained" absent the defendant's behavior, and if it is not an independently sufficient source of the plaintiff's harms.  Restatement (Second) of Torts § 432; *Point Prods. A.G.* v. *Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 342-43 (S.D.N.Y. 2002); *Rodriguez v. Budget Rent-A-Car Sys., Inc.*, 841 N.Y.S.2d 486, 490 (1st Dep't 2007).  Plaintiff does not, and cannot, allege that its harms would have been avoided had any one Defendant not engaged in the challenged production and promotion activities.  Nor can Plaintiff allege that Defendants' conduct served as an independently sufficient source of its harms.

conduct was "without justification or permission." *Korsinsky v. Rose*, 993 N.Y.S.2d 92, 96 (2d Dep't 2014) (affirming dismissal of trespass claim); *Boring v. Town of Babylon*, 47 N.Y.S.3d 419, 421 (2d Dep't 2017) (affirming dismissal of trespass claim). Under New York law, a plaintiff cannot adequately (or reasonably) plead that an alleged trespass was without justification or permission when it consented to the alleged misconduct. *See,* e.g., *Frederique v. Cty. of Nassau*, 168 F. Supp. 3d 455, 489 (E.D.N.Y. 2016).

Plaintiff alleges that it did not consent to seawater entering its property, FAC ¶¶ 149, 152, but it does not allege that Defendants produced, marketed, and sold fossil fuels without Plaintiff's consent—nor could it, given that Plaintiff itself regulates and consumes massive amounts of fossil fuel products.[24] Having consented to (and benefited from, including financially) Defendants' conduct for decades, Plaintiff's trespass claim must fail.

### 4.  Plaintiff's claims are barred by the *in pari delicto* doctrine

Plaintiff's claims are also barred by the doctrine of *in pari delicto*. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010). "The doctrine prohibits one party from suing another where the plaintiff was 'an active, voluntary participant in the unlawful activity that is the subject of the suit.'" *In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 189 (S.D.N.Y. 2014) (quoting *Pinter v. Dahl*, 486 U.S. 622, 636 (1988)). "[T]he principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be 'weakened by exceptions.'" *Kirschner*, 15 N.Y.3d at 464 (citing *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 470

---

[24] *See, e.g.,* Inventory of New York City Greenhouse Gas Emissions in 2015 at 7, 35 (Apr. 2017), http://on.ny.gov/2nPATCT (New York City "government uses large amounts of energy each year" and its "buildings were responsible for 67 percent of citywide greenhouse gas (GHG) emissions"); N.Y.C. Admin. Code §§ 24-168.1, 24-169 (regulating the composition of heating oil and fuel oil); NYC Clean Fleet (2015), http://on.nyc.gov/1T629Eo ("New York City government operates a fleet consisting of 27,152 fuel-burning vehicles.").

(1960)).  Where warranted, "in pari delicto may be resolved on the pleadings in an appropriate

action."  *Kirschner*, 15 N.Y.3d at 459 n.3; *see also In re Bernard L. Madoff Secs. LLC*, 721 F.3d

54, 65 (2d Cir. 2013); *Donovan v. Rothman*, 756 N.Y.S.2d 514, 514–15 (1st Dep't 2003).

Plaintiff concedes that "[t]he basic facts of the greenhouse effect have been known for a

long time," FAC ¶ 72, yet despite this knowledge, Plaintiff has for decades authorized the

activities it now claims created the nuisance, encouraged its residents to use fossil fuels, and

reaped economic benefits from this reliance, including as an investor in fossil fuel companies.

Indeed, fossil fuels provide "more than 98 percent of in-city electricity production by power

plants," and residents of New York City use millions of gallons of fossil fuels every day.  *See*

City of New York, *Building a Stronger, More Resilient New York* (2013), at 109, 133–34 (cited

at FAC ¶ 66 n.25).  Plaintiff has also actively participated in the promotion and transportation of

fossil fuels, making "[t]he New York metropolitan area [] the largest liquid fuels hub on the East

Coast and one of the largest in the country."  *Id.* at 133.  Rather than eschew the benefits of fossil

fuels, Plaintiff has reaped huge rewards from them, financial and otherwise.

**D.    Plaintiff's Claims Are Not Justiciable**

Alternatively, Plaintiff's claims are non-justiciable because they extend far beyond "the

proper—and properly limited—role of the courts in a democratic society."  *DaimlerChrysler*

*Corp. v. Cuno*, 547 U.S. 332, 341 (2006).  Although the Second Circuit found otherwise in *AEP*,

the Supreme Court affirmed that portion of the decision by an equally divided court without

analysis or discussion, and reversed the judgment on other grounds.  *See AEP*, 582 F.3d at 321–

49, *rev'd on other grounds*, 564 U.S. at 420.  For that reason, and because the non-justiciability

arguments are stronger here, this Court should dismiss on these grounds as well.

**1.    Plaintiff's novel claims do not present a justiciable case or controversy**

Before a grievance can be litigated, a plaintiff must show that it has presented "a 'case' or

'controversy' that is, in James Madison's words, 'of a Judicial Nature.'" *DaimlerChrysler*, 547

U.S. at 341. Courts are "without competence" to address matters "of high policy for resolution

within the legislative process." *Diamond v. Chakrabarty*, 447 U.S. 303, 317–18 (1980). Here,

Plaintiff's novel claims have no analogue to claims at common law that were considered

appropriate for judicial resolution. Rather, Plaintiff asks this Court to make the type of

"debatable social judgment" that is "not wisely required of courts." *See Pegram v. Herdrich*,

530 U.S. 211, 221 (2000); *see also Verizon Comm'cns Inc. v. Law Offices of Curtis v. Tinko,*

*LLP*, 540 U.S. 398, 408 (2004) (rejecting suit that would have "require[d] antitrust courts to act

as central planners"). Adjudicating these claims would thus violate the separation of powers.

### 2. Plaintiff's claims present non-justiciable political questions

As several courts have previously recognized, the political question doctrine prevents

adjudication of global-warming-related tort claims. *See, e.g.*, *Gen. Motors*, 2007 WL 2726871,

at *16; *Kivalina*, 663 F. Supp. 2d at 876–77; *Comer*, 839 F. Supp. 2d at 865. That doctrine limits

the judiciary's authority to "formulate national policies or develop standards for matters not legal

in nature." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (citation

omitted). The Supreme Court has identified six factors for determining when the political

question doctrine applies, any one of which warrants dismissal. *Baker v. Carr*, 369 U.S. 186,

271 (1962); *see also Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 72 (2d Cir. 2005).

The issues raised by Plaintiff are matters of global concern that are "committed by the

Constitution to the political departments of the Federal Government." *United States v. Pink*, 315

U.S. 203, 222–23 (1942); *see also Baker*, 369 U.S. at 211. And "the political branches" have in

fact "weighed in on the issue, and have made foreign policy determinations regarding the United

States' role in the international concern about global warming," *Gen. Motors*, 2007 WL

2726871, at *14.

The second *Baker* factor reflects the axiom that "judicial action must be governed by *standard,* by *rule*. . . .  [L]aw pronounced by the courts must be principled, rational, and based upon reasoned distinctions."  *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality).  As courts have recognized, global-warming-related tort claims are ill-suited for judicial adjudication because the factfinder must balance the utility of using fossil fuels against the risks posed by emissions, and there are no judicial standards to make that assessment.  *See Kivalina*, 663 F. Supp. 2d at 874–75; *Gen. Motors*, 2007 WL 2726871, at *15.

Nor is there a "manageable method of discerning the entities that are creating and contributing to the alleged nuisance" because "there are multiple worldwide sources of atmospheric warming across myriad industries and multiple countries."  *Gen. Motors*, 2007 WL 2726871, at *15; *see also Kivalina*, 663 F. Supp. 2d at 875–76.  And on the question of remedies, there is no "guidance" for "determining who should bear the costs associated with the global climate change that admittedly result from multiple sources around the globe."  *Gen. Motors*, 2007 WL 2726871, at *15.  The Court also lacks any legal method for allocating fault when Plaintiff's alleged injuries stem from hundreds of years of emissions, the vast majority of which are not attributable to these Defendants.  Accordingly, "the allocation of fault—and cost—of global warming is a matter appropriately left for determination by the executive or legislative branch."  *Kivalina*, 663 F. Supp. 2d at 877; *see also Gen. Motors*, 2007 WL 2726871, at *15.

The third *Baker* factor also supports dismissal because addressing global warming involves complex policy judgments.  *See AEP*, 564 U.S. at 427.  Adjudicating Plaintiff's claims "would require the Court to balance the competing interests of reducing global warming emissions and the interests of advancing and preserving economic and industrial development," which is "the type of initial policy determination to be made by the political branches."  *Gen.*

*Motors*, 2007 WL 2726871, at *8; *see also Comer*, 839 F. Supp. 2d at 864–65.  Plaintiff's claims should be dismissed, lest this Court be dragged "into precisely the geopolitical debate more properly assigned to the coordinate branches." *Gen. Motors*, 2007 WL 2726871, at *10.

To be sure, the Second Circuit previously held that nuisance claims brought against select greenhouse gas emitters were not barred by the political question doctrine.  *AEP*, 582 F.3d at 321–32.  But in *AEP* the plaintiffs sought only "to limit emissions from six domestic coal-fired electricity plants," *id.* at 325, whereas here Plaintiff targets the worldwide fossil fuel production of five large corporations, two of which are foreign-owned.  Thus, unlike *AEP*, where the requested relief "applie[d] in only the most tangential and attenuated way to the expansive domestic and foreign policy issues raised by Defendants," *id.*, the relief sought here directly interferes with national energy policy and the federal government's role in international efforts to address global warming.  Finally, the broader scope of Plaintiff's allegations here makes it difficult to discern a principled rule of decision.

### 3.  Plaintiff lacks Article III standing

Plaintiff's claims should also be dismissed because Plaintiff has not sufficiently pleaded injury-in-fact, traceability, or redressability for purposes of Article III standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

An injury-in-fact must be "actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  But Plaintiff's broad allegations of injury are the types of "conclusory statements and untethered assertions" that are insufficient.  *Parker Madison Partners v. Airbnb, Inc.*, 2017 WL 4357952, at *4 (S.D.N.Y. Sept. 29, 2017). Nor does Plaintiff explain how it has "suffered its own individual harm apart from the general harm caused by climate change."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009).  And although Plaintiff alleges it has taken "proactive steps" relating to global

34

warming, FAC ¶ 117, it "cannot manufacture standing by incurring costs in anticipation of non-imminent harm," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 422 (2013).  Moreover, Plaintiff's alleged future injuries are "contingent upon . . . decision[s] to be made by third part[ies] that ha[ve] not yet acted," so they are "not ripe as the subject of decision in a federal court."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013).

Nor can Plaintiff's injuries "fairly . . . be traced to the challenged action of the [D]efendant[s]."  *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976).  Plaintiff's causation theory depends on a long chain of events, beginning with Defendants' production and eventually ending with the higher sea levels near New York City.  In between are the "independent actions of [billions of] third parties" using fossil fuels in different ways, the accumulation of greenhouse gases from all sources on Earth, rising temperatures, and melting Arctic ice.  *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 2010 WL 2077214, at *7 (S.D.N.Y. May 14, 2010).  And Plaintiff's concession that "[g]reenhouse gas molecules cannot be traced to their source," FAC ¶ 75, makes attribution and traceability impossible because "a vast multitude of emitters worldwide" emit greenhouse gases that "mix quickly, stay in the atmosphere for centuries, and, as a result, are undifferentiated in the global atmosphere."  *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1143–44 (9th Cir. 2013); *cf. Gen. Motors*, 2007 WL 2726871, at *15.

This Court also cannot redress Plaintiff's injuries through monetary or equitable relief.  *See Simon*, 426 U.S. at 41–42.  Even if Defendants were to cease their extraction activities, Plaintiff's alleged injuries would likely "continue unabated" because greenhouse gas "emissions [are] not a localized problem . . . but a global occurrence."  *Bellon*, 732 F.3d at 1147.

## CONCLUSION

For the foregoing reasons, Plaintiff's claims should be dismissed with prejudice.

Dated: March 30, 2018

New York, New York


Herbert J. Stern (pro hac vice)
Joel M. Silverstein
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
Florham Park, NJ 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

Neal S. Manne (pro hac vice forthcoming)
Johnny W. Carter (pro hac vice forthcoming)
Erica Harris
Steven Shepard
Laranda Walker (pro hac vice forthcoming)
Kemper Diehl
Michael Adamson
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  713.651.9366
Facsimile:  713.654.6666

M. Randall Oppenheimer
(*pro hac vice* forthcoming*)*
roppenheimer@omm.com
Dawn Sestito
(*pro hac vice* forthcoming*)*
dsestito@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
(213) 430-6000
Fax: (213) 430-6407

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
EXXON MOBIL CORPORATION
1301 Fannin Street
Houston, TX 77002-7014
(832) 624-6336
Fax: (262) 313-2402

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Anne Champion*

Caitlin J. Halligan
Andrea E. Neuman
Anne Champion
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

Theodore J. Boutrous, Jr. (admission forth-
coming)
William E. Thomson (pro hac vice)
Joshua S. Lipshutz (pro hac vice)
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Defendant*
*CHEVRON CORPORATION*

By: */s/ Theodore V. Wells, Jr.*

Theodore V. Wells, Jr.
twells@paulweiss.com
Daniel J. Toal
dtoal@paulweiss.com
Jaren Janghorbani
jjanghorbani@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendant EXXON MOBIL*
*CORPORATION*

Tracie J. Renfroe
(*pro hac vice forthcoming*)
trenfroe@kslaw.com
Carol M. Wood
(*pro hac vice forthcoming*)
cwood@kslaw.com
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, Texas  77002
Telephone:  (713) 751-3200
Facsimile:  (713) 751-3290

By: */s/ John F. Savarese*

John F. Savarese
JFSavarese@wlrk.com
Jeffrey M. Wintner
JMWintner@wlrk.com
Ben M. Germana
BMGermana@wlrk.com
Jonathan Siegel
JRSiegel@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for Defendant CONOCOPHILLIPS*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF NEW YORK,

                   Plaintiff,

    v.

BP P.L.C.; CHEVRON CORPORATION;
CONOCOPHILLIPS; EXXON MOBIL CORPORATION;
and ROYAL DUTCH SHELL PLC,

                   Defendants.

Case No. 18 Civ. 182 (JFK)

## AFFIRMATION OF SERVICE

I, Vincent Eisinger, declare under penalty of perjury that I served a copy of Chevron

Corporation's Notice of Motion to Dismiss dated March 30, 2018, and the Memorandum of Law

of Chevron Corporation, ConocoPhillips, and Exxon Mobil Corporation Addressing Common

Grounds in Support of their Motions to Dismiss the Amended Complaint, upon on the parties

listed on **Exhibit A** by email on March 30, 2018.  This service is made pursuant to the agreement

reached with counsel for Plaintiff the City of New York to accept service by email.


Dated:  March 30, 2018               GIBSON, DUNN & CRUTCHER LLP

                         By:     */s/ Vincent Eisinger*
                                Vincent Eisinger
                                Gibson, Dunn & Crutcher LLP
                                200 Park Avenue
                                New York, NY 10166-0193
                                Telephone:  (212) 351-3993
                                Facsimile:  (212) 817-9593
                                Email:  veisinger@gibsondun.com

                                *Attorneys for Chevron Corporation*

**Exhibit A**

Susan E. Amron
New York City Law Department
Office of the Corporation Counsel
100 Church Street
New York, NY 10007
Telephone:  212-788-1578
Email:  samron@law.nyc.gov

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1918 8th Avenue
Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Email:  steve@hbsslaw.com

Matthew F. Pawa
Hagens Berman Sobol Shapiro LLP
1280 Centre Street, Suite 230
Newton Centre, Massachusetts  02459
Telephone:  (617) 641-9550
Email:  mattp@hbsslaw.com

Christopher A. Seeger
Seeger Weiss LLP
77 Water Street
New York, New York 10005
Telephone:  (212) 584-0799
Email:  cseeger@seegerweiss.com

*Counsel for the City of New York*

Jaren Janghorbani
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3211
Email:  jjanghorbani@paulweiss.com

*Counsel for Exxon Mobil Corporation*

Philip H. Curtis
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York  10019
Telephone:  (212) 836-7199
Email:  philip.curtis@arnoldporter.com

*Counsel for BP P.L.C.*

Daniel P. Collins
Munger, Tolles & Olson LLP
350 South Grand Avenue
Los Angeles, California  90071
Telephone:  (213) 683-9125
Email:  daniel.collins@mto.com

*Counsel for Royal Dutch Shell PLC*

Ben M. Germana
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-2000
Email:  bmgermana@wlrk.com

*Counsel for ConocoPhillips*