**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------X
CITY OF NEW YORK,                      :
                                       :
                   Plaintiff,          :      No. 18 Civ. 182 (JFK)
       -against-                       :
                                       :      **OPINION & ORDER**
BP P.L.C., CHEVRON CORPORATION,        :
CONOCOPHILLIPS,                        :
EXXON MOBIL CORPORATION,               :
and ROYAL DUTCH SHELL, PC,             :
                                       :
                   Defendants.         :
--------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED: 7/19/2018 _____     │
└─────────────────────────────────┘
```

APPEARANCES

FOR PLAINTIFF CITY OF NEW YORK:

       Zachary W. Carter
       Susan E. Amron
       Kathleen C. Schmid
       Margaret C. Holden
       Noah Kazis
       CORPORATION COUNSEL OF THE CITY OF NEW YORK
       Steve W. Berman
       Matthew F. Pawa
       Benjamin A. Krass
       Wesley Kelman
       HAGENS BERMAN SOBOL SHAPIRO LLP
       Christopher A. Seeger
       Stephen A. Weiss
       Diogenes P. Kekatos
       SEEGER WEISS LLP

FOR DEFENDANT CHEVRON CORPORATION:

       Caitlin J. Halligan
       Andrea E. Neuman
       Anne Champion
       Theodore J. Boutrous, Jr.
       William E. Thomson
       Joshua S. Lipshitz
       GIBSON, DUNN & CRUTCHER LLP
       Herbert J. Stern
       Joel M. Silverstein
       STERN & KILCULLEN, LLC

        Neal S. Manne
        Johnny W. Carter
        Erica Harris
        Steven Shepard
        Laranda Walker
        Kemper Diehl
        Michael Adamson
        SUSMAN GODFREY LLP

FOR DEFENDANT EXXON MOBIL CORPORATION:

        Theodore V. Wells, Jr.
        Daniel J. Toal
        Jaren Janghorbani
        PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
        M. Randall Oppenheimer
        Dawn Sestito
        O'MELVENY & MYERS LLP
        Patrick J. Conlon
        EXXON MOBIL CORPORATION

FOR DEFENDANT CONOCOPHILLIPS:

        John F. Savarese
        Jeffrey M. Wintner
        Ben M. Germana
        Johnathan Siegel
        WACHTELL, LIPTON, ROSEN & KATZ
        Tracie J. Renfroe
        Carol M. Wood
        KING & SPALDING LLP

**JOHN F. KEENAN, United States District Judge:**

        Before the Court is a motion by Defendants Chevron

Corporation ("Chevron"), ConocoPhillips, and Exxon Mobil

Corporation ("Exxon") (together, the "U.S.-based Defendants") to

dismiss Plaintiff City of New York's (the "City") amended

complaint under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  For the reasons stated below, Defendants' motion is

granted and the City's amended complaint is dismissed.

## I.    Background

The following facts and allegations are taken from the amended complaint.  Defendants BP P.L.C. ("BP"), Chevron, ConocoPhillips, Exxon, and Royal Dutch Shell ("Shell") (together, "Defendants") are multinational oil and gas companies. (Am. Compl. ¶¶ 16-20.)  Defendants produce, market, and sell mass quantities of fossil fuels, primarily oil and natural gas. (Id. ¶ 1.)  Defendants are, respectively, the first (Chevron), second (Exxon), fourth (BP), sixth (Shell), and ninth (ConocoPhillips) largest cumulative producers of fossil fuels worldwide from the mid-nineteenth century to present. (Id. ¶ 76.)  Defendants are collectively responsible, through their production, marketing, and sale of fossil fuels, for over eleven percent of all the carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the Industrial Revolution. (Id. ¶ 3.)

Climate science clearly demonstrates that the burning of fossil fuels is the primary cause of climate change. (Id. ¶¶ 69-70.)  When combusted, fossil fuels emit greenhouse gases, including carbon dioxide, the "largest contribut[or]" to climate change of any source. (Id. ¶ 74.)  Additionally, one of Defendants' primary fossil fuel products, natural gas, is composed of methane, which is the second largest greenhouse gas contributor to global warming. (Id.)  Global warming, or the

3

gradual heating of the Earth's surface and atmosphere caused by accumulation of greenhouse gas pollution in the atmosphere, has led to hotter temperatures, longer and more severe heat waves, extreme precipitation events including heavy downpours, rising sea levels, and other severe and irreversible harms. (Id. ¶ 2.) The City alleges that, through their production and sale of fossil fuel products, Defendants have contributed to the temperature increases and global-warming-induced sea-level rise affecting New York City. (Id. ¶ 24.)

According to the amended complaint, Defendants have known for decades that their fossil fuel products pose risks of severe impacts on the global climate through the warnings of their own scientists, or those of the U.S. trade association, American Petroleum Institute ("API"). (Id. ¶¶ 72, 80.) Beginning in the 1950s, API began warning its members that fossil fuels pose a grave threat to the global climate. (Id. ¶ 82.) Between 1979 and 1983, the API and Defendants, their predecessors, and agents formed a task force to monitor and share climate research, called the "Climate and Energy Task Force" (the "Task Force"). (Id.) The minutes from Task Force meetings show that the Task Force was aware of a scientific consensus on the likelihood of a significant global temperature rise resulting from increased carbon dioxide levels that would cause "globally catastrophic events." (Id.) Defendants' internal documents also demonstrate

4

that Defendants were aware of the "catastrophic" threat that
fossil fuels posed to the global climate. (Id. ¶¶ 85, 88.)

Despite their early knowledge of climate change risks,
Defendants extensively promoted fossil fuels for pervasive use,
while denying or downplaying these threats. (Id. ¶¶ 93-94.)
Defendants engaged in an overt public relations campaign
intended to cast doubt on climate science. (Id. ¶ 94.)
Initially, the campaign tried to show that climate change was
not occurring or was not caused by Defendants' products. (Id.)
More recently, the campaign has sought to minimize the risks and
harms from climate change. (Id.)  Meanwhile, beginning in the
mid-1980s, Exxon and other major oil and gas companies,
including Mobil and Shell, took actions to protect their own
business assets from the impacts of climate change, including
raising the decks of offshore platforms, protecting pipelines
from coastal erosion, and designing helipads, pipelines, and
roads in the warming Arctic. (Id. ¶ 91.)  Although the amended
complaint contains extensive allegations regarding Defendants'
past attempts to deny or downplay the effects of fossil fuel use
on climate change, in their motion to dismiss, Defendants do not
dispute the scientific consensus that greenhouse gas emissions
from fossil fuel use have contributed to global warming.

According to the New York City Panel on Climate Change
("NPCC"), the expert committee convened to provide scientific

5

advice, guidance, and projections on climate change, climate change is already affecting New York City and will have a significant impact in the future. (Id. ¶ 10.)  The average annual temperature in New York City has increased at a rate of 0.79°F per decade over the last thirty years. (Id. ¶ 57.) Without mitigation, the hotter summers projected for 2020 could cause an estimated thirty to seventy percent increase in heat-related deaths in the New York City. (Id. ¶ 61.)  In addition, New York City is exceptionally vulnerable to sea-level rise due to its long coastline and its large floodplain that is home to more than 218,000 New Yorkers. (Id. ¶ 64.)  Sea-level rise in New York City has averaged 1.2 inches per decade since 1900, nearly twice the observed global rate of 0.5 to 0.7 inches per decade over a similar time period. (Id. ¶ 57.)  Approximately sixty percent of the relative sea-level rise is driven by climate-related factors. (Id.)

Given New York City's particular vulnerability to climate change, the City has been forced to take proactive steps to protect itself and its residents from the dangers and impacts of global warming. (Id. ¶ 117.)  After Hurricane Sandy, the City launched a $20 billion-plus multilayered investment program in climate resiliency. (Id. ¶ 119.)  The first steps of this effort include constructing levees and sea walls, elevating facilities and streets, and waterproofing and hardening infrastructure.

(Id.)  In addition, the City must promptly take more robust measures to make New York City more resilient and protect the public and City property from climate change, including enlarging existing storm and wastewater storage facilities and installing additional new facilities, as well as associated infrastructure and pumping facilities, to prevent flooding in low-lying areas that are vulnerable to rising seas or increasingly severe downpours. (Id. ¶ 122.)

The City alleges that Defendants' ongoing conduct continues to exacerbate global warming and cause recurring injuries to New York City. (Id. ¶ 9.)  Defendants continue to produce, market, distribute, and sell fossil fuels in massive quantities; to promote fossil fuel consumption in these massive quantities; and to downplay the threat posed by climate change. (Id. ¶ 131.) This ongoing conduct will cause increasingly severe injuries to New York City, including new and more significant encroachments upon and interferences with City property, and increasingly severe threats to public health. (Id.)  The City brings this suit to "shift the costs of protecting the City from climate change impacts back onto the companies that have done nearly all they could to create this existential threat." (Id. ¶ 2.)

The City alleges three causes of action against Defendants: (1) public nuisance, (2) private nuisance, and (3) trespass. (Id. ¶¶ 132-152.)  The City requests compensatory damages for

past and future costs incurred by the City to protect its infrastructure and property, and to protect the public health, safety, and property of its residents from the impacts of climate change. (Id. at 73-74.)  The City also requests an equitable order ascertaining damages and granting an injunction to abate the public nuisance and trespass that would not be effective unless Defendants fail to pay the court-determined damages for the past and permanent injuries inflicted (a "Boomer injunction"). (Id. at 74.)

On March 30, 2018, the U.S.-based Defendants moved to dismiss the amended complaint under Rules 12(b)(1) and 12(b)(6).[1] The U.S.-based Defendants argue in their joint motion that (1) the City's claims arise under federal common law and should be dismissed, (2) the City's claims are independently barred by numerous federal doctrines, (3) the amended complaint does not allege viable state-law claims, (4) the City's claims are not justiciable, and (5) the City has failed to allege proximate cause.

---

[1] Exxon and ConocoPhillips also moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.  Per agreement of the parties, the Court deferred further briefing on this issue until the Court rules on the motion to dismiss under Rules 12(b)(1) and 12(b)(6).  In addition, BP and Shell's (the "foreign Defendants") time to respond to the complaint has been adjourned pending the Court's decision on the instant motion to dismiss.

## II.  Discussion

### A.  Legal Standard

Rule 12(b)(1) requires dismissal when "the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  A "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Id. (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)). Under Rule 12(b)(1), the court must accept all factual allegations in the complaint as true and draw inferences in the light most favorable to the plaintiff. Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. On a motion to dismiss, a court must accept the factual allegations in the complaint as true and draw reasonable inferences in the plaintiff's favor. Tsirelman v. Daines, 794 F.3d 310, 313 (2d Cir. 2015).

### B.   Analysis

**1.   Federal Common Law Displaces The City's State Law Claims**

The Court agrees that the City's claims are governed by federal common law.  The Supreme Court has recognized that there are some limited areas in which a federal rule of decision is "necessary to protect uniquely federal interests." Tex. Indus. Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981) (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 426 (1964)).  Where "the interstate or international nature of the controversy makes it inappropriate for state law to control . . . our federal system does not permit the controversy to be resolved under state law." Id. at 641.  The Supreme Court has held that "the control of interstate pollution is primarily a matter of federal law." Int'l Paper Co. v. Ouellette, 479 U.S. 481, 492 (1987); see also Illinois v. City of Milwaukee, 406 U.S. 91, 103 (1972) ("Milwaukee I") ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law."); Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 855 (9th Cir. 2012) ("Post-Erie, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution.").  "Federal common law and not the varying common law of the individual States is . . . necessary to be recognized as a basis for dealing in uniform standard with the

environmental rights of a State against improper impairment by
sources outside its domain." Milwaukee I, 406 U.S. at 107 n.9.

The City's global-warming tort claims are based on
Defendants' worldwide fossil fuel production and "the use of
their fossil fuel products [which] continue[] to emit greenhouse
gases and exacerbate global warming." (Am. Compl. ¶¶ 76, 143.)
As pointed out on page three, Defendants are among the largest
cumulative producers of fossil fuels worldwide since the mid-
nineteenth century. (Id. ¶ 76.)  Defendants are allegedly
collectively responsible, through their production, marketing,
and sale of fossil fuels, for over eleven percent of all the
carbon and methane pollution from industrial sources that has
accumulated in the atmosphere since the Industrial Revolution.
(Id. ¶ 3.)  The City itself alleges that "[g]reenhouse gas
molecules cannot be traced to their source, and greenhouse gases
quickly diffuse and comingle in the atmosphere.  However,
because of their rapid and widespread global dispersal,
greenhouse gas emissions from each of Defendants' fossil fuel
products are present in the atmosphere in New York State." (Id.
¶ 75.)  Widespread global dispersal is exactly the type of
"transboundary pollution suit[]" to which federal common law
should apply. Kivalina, 69 F.3d at 855-58; see also California
v. BP P.L.C., No. C 17-06011(WHA), 2018 WL 1064293, at *3 (N.D.
Cal. Feb. 27, 2018) ("[T]he transboundary problem of global

warming raises exactly the sort of federal interests that necessitate a uniform solution.").

Although the City agrees that "federal common law has long applied to" suits against "direct emitters of interstate pollution," it contends that its claims are not governed by federal common law because "the City bases liability on defendants' production and sale of fossil fuels—not defendants' direct emissions of [greenhouse gases]." (Pl.'s Mem. of L. in Opp'n to Defs.' Mot. to Dismiss at 27-29, ECF No. 101 (filed May 4, 2018) [hereinafter Pl.'s Mem.].)  However, regardless of the manner in which the City frames its claims in its opposition brief, the amended complaint makes clear that the City is seeking damages for global-warming related injuries resulting from greenhouse gas emissions, and not only the production of Defendants' fossil fuels.

According to the amended complaint, "[greenhouse gas] pollution from the burning of fossil fuels is the dominant cause" of global warming. (Am. Compl. ¶ 52.)  Indeed, the City alleges that Defendants are substantial contributors to climate change through their production of massive quantities of fossil fuels, because, when combusted, these fossil fuels emit carbon dioxide and other greenhouse gases. (Id. ¶¶ 73-74.)  "[A]s [Defendants] know, the use of their fossil fuel products continues to emit greenhouse gases and exacerbate global warming

12

and the City's injuries." (Id. ¶¶ 143, 151.)  "Defendants . . .
should reasonably expect their tortious acts to have
consequences . . . includ[ing] increasing the concentration of
[greenhouse gases], including carbon dioxide, as well as global
warming injuries, including accelerated sea-level rise and heat
impacts." (Id. ¶ 46.)  "The City's waterfront is . . . being
harmed by global warming . . . due to past and continuing
[greenhouse gas] pollution." (Id. ¶ 64.)

Thus, the City's claims are ultimately based on the
"transboundary" emission of greenhouse gases, indicating that
these claims arise under federal common law and require a
uniform standard of decision. See BP, 2018 WL 1064293, at *3
("If ever a problem cried out for a uniform and comprehensive
solution, it is the geophysical problem described by the
complaints, a problem centuries in the making (and studying)
with causes ranging from volcanoes, to wildfires, to
deforestation to stimulation of other greenhouse gases—and, most
pertinent here, to the combustion of fossil fuels.").

**2.   The Clean Air Act Displaces the City's Claims**

To the extent that the City brings nuisance and trespass
claims against Defendants for domestic greenhouse gas emissions,
the Clean Air Act displaces such federal common law claims under
American Electric Power Co. v. Connecticut, 564 U.S. 410 (2011)
("AEP") and Native Village of Kivalina v. ExxonMobil Corp., 696

F.3d 849 (9th Cir. 2012).  Legislative displacement of federal common law "does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law" because "it is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest." AEP, 564 U.S. at 423-424 (quoting City of Milwaukee v. Illinois & Michigan, 451 U.S. 304, 317 (1981) ("Milwaukee II")).  "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue." Id. at 424 (quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978)); see also Kivalina, 696 F.3d at 856 ("The salient question is 'whether Congress has provided a sufficient legislative solution to the particular [issue] to warrant a conclusion that [the] legislation has occupied the field to the exclusion of federal common law.'" (quoting Michigan v. U.S. Army Corps Of Eng'rs, 667 F.3d 765, 777 (7th Cir. 2011)).

In AEP, eight states, the City, and three private land trusts brought a public nuisance suit under federal common law against the five largest emitters of carbon dioxide in the United States. AEP, 564 U.S. at 418.  The plaintiffs alleged that "defendants' carbon-dioxide emissions created a 'substantial and unreasonable interference with public rights'"

and sought abatement of the carbon-dioxide emissions. Id. at
419.  The Supreme Court examined whether plaintiffs' claims were
displaced by the Clean Air Act, which directs the EPA
Administrator to "establish standards of performance for
emission of pollutants" from stationary sources, and to regulate
existing stationary sources and issue emission guidelines. Id.
at 424 (citing 42 U.S.C. § 7411).  The Clean Air Act also
"provides multiple avenues for enforcement" by the Environmental
Protection Agency ("EPA"), including "impos[ing] administrative
penalties for noncompliance" and "commenc[ing] civil actions
against polluters in federal court." Id. at 425.  The Court
noted that the Clean Air Act "itself [] provides a means to seek
limits on emissions of carbon dioxide from domestic power
plants—the same relief the plaintiffs seek by invoking federal
common law." Id.  Accordingly, the Court held that "the Clean
Air Act and the EPA actions it authorizes displace any federal
common law right to seek abatement of carbon-dioxide emissions
from fossil-fuel fired power plants." Id. at 424.

    In the Kivalina case, a small city in Alaska brought a
public nuisance action against multiple oil, energy, and utility
companies, alleging that the defendants' "emissions of large
quantities of greenhouse gases" had resulted in global-warming
related damages, including sea-level rise and severe erosion.
Kivalina, 696 F.3d at 854.  Unlike in AEP, the plaintiff did not

15

seek abatement of emissions, but rather damages for harm caused
by past emissions. Id. at 857.  The Ninth Circuit held that,
under AEP, the Clean Air Act displaced plaintiff's federal
common law claim seeking damages for harm caused by past
emissions, as the Clean Air Act already provides a means to
regulate carbon dioxide emissions from domestic power plants.
Id. at 856-58.  In so doing, the court noted that "the Supreme
Court has instructed that the type of remedy asserted is not
relevant to the applicability of the doctrine of displacement."
Id. at 857.

Here, the City seeks damages for global warming-related
injuries caused by greenhouse gas emissions resulting from the
combustion of Defendants' fossil fuels.  To determine liability
for trespass and nuisance, factfinders would have to consider
whether emissions resulting from the combustion of Defendants'
fossil fuels created an "unreasonable interference" and an
"unlawful invasion" on City property. Milwaukee II, 451 U.S. at
348; In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab.
Litig., 725 F.3d 65, 119 (2d Cir. 2013).  As an initial matter,
it is not clear that Defendants' fossil fuel production and the
emissions created therefrom have been an "unlawful invasion" in
New York City, as the City benefits from and participates in the
use of fossil fuels as a source of power, and has done so for
many decades.  More importantly, Congress has expressly

delegated to the EPA the determination as to what constitutes a reasonable amount of greenhouse gas emission under the Clean Air Act. See AEP, 564 U.S. at 428-29 (holding that requiring individual federal judges in public nuisance suits to determine what amount of carbon dioxide emissions is unreasonable "cannot be reconciled with the decisionmaking scheme Congress enacted" with the Clean Air Act); Kivalina, 696 F.3d at 857 ("Congress ha[s] acted to empower the EPA to regulate greenhouse gas emissions").  Thus, under AEP and Kivalina, the Clean Air Act displaces the City's claims seeking damages for past and future domestic greenhouse gas emissions brought under federal common law. See County of San Mateo v. Chevron Corp., 294 F. Supp. 3d 934, 937 (2018) ("Kivalina stands for the proposition that federal common law is not just displaced when it comes to claims against domestic sources of emissions but also when it comes to claims against energy producers' contributions to global warming and rising sea levels.").

The City argues that its claims are not displaced because "[d]isplacement of federal common law occurs only where Congress has spoken directly to the particular issue." (Pl.'s Mem. at 31.)  The City concedes that "[i]t is common ground here that the [Clean Air Act] would displace a federal common law public nuisance claim seeking abatement of greenhouse gas emissions from out of state" under AEP, but because the Clean Air Act

17

"does not regulate the production and sale of fossil fuels," the City contends that its claims are not displaced. (Id.)  As discussed above, however, the City alleges that its climate-change related injuries are the direct result of the emission of greenhouse gases from the combustion of Defendants' fossil fuels, and not the production and sale of those fossil fuels. Thus, the City ultimately seeks to hold Defendants liable for the same conduct at issue in AEP and Kivalina:  greenhouse gas emissions.  As Defendants note, "[the City]'s alleged injuries arise (if at all) only because third-party users of fossil fuels—located in all 50 states and around the world—emit greenhouse gases." (Defs.' Reply Mem. of L. in Supp. of Mot. to Dismiss at 4, ECF No. 109 (filed May 4, 2018).)

Thus, because the Clean Air Act has spoken "directly to the question" of domestic greenhouse gas emissions, the City's claims are displaced. See, e.g., San Mateo, 294 F. Supp. 3d at 937 (plaintiffs' claims that defendant's contributions to greenhouse gas emissions constitute "a substantial and unreasonable interference with public rights" are displaced by the Clean Air Act under Kivalina).

The City also argues that, if the Clean Air Act displaces its federal common law claims, state law claims then become available to the extent they are not preempted by statute. (Pl.'s Mem. at 30); see also BP, 2018 WL 104293, at *4 ("[W]hen

18

congressional action displaces federal common law, state law
becomes available to the extent it is not preempted by
statute.").  In AEP, the Supreme Court noted that because the
Clean Air Act displaced claims brought against domestic emitters
for transboundary pollution, state law claims could be brought,
to the extent they are not also preempted, under "the law of
each State where the defendants operate power plants." AEP, 564
U.S. at 429.

However, the City has not sued under New York law for
claims related to the production of fossil fuels in New York.
The City brings claims for damages caused by global greenhouse
gas emissions resulting from the combustion of Defendants'
fossil fuels, which are produced and used "worldwide." (Am.
Compl. ¶ 76.)  As discussed above, these types of "interstate
pollution" claims arise under federal common law, and the Clean
Air Act displaces claims arising from damages caused by domestic
greenhouse gas emissions because Congress has expressly
delegated these issues to the EPA.  Given the interstate nature
of these claims, it would thus be illogical to allow the City to
bring state law claims when courts have found that these matters
are areas of federal concern that have been delegated to the
Executive Branch as they require a uniform, national solution.
See Milwaukee II, 451 U.S. at 313 n.7 ("[I]f federal common law
exists, it is because state law cannot be used.").  Climate

change is a fact of life, as is not contested by Defendants. But the serious problems caused thereby are not for the judiciary to ameliorate.  Global warming and solutions thereto must be addressed by the two other branches of government.

### 3. The City's Claims Interfere with Separation of Powers and Foreign Policy

As the City points out, and as courts have recognized, the Clean Air Act regulates only domestic emissions.[2] See AEP, 564 U.S. at 425 ("The [Clean Air] Act thus provides a means to seek limits on emissions of carbon dioxide from domestic power plants."); see also BP, 2018 WL 104293, at *4 ("The Clean Air Act displaced the nuisance claims asserted in Kivalina and AEP because the Act 'spoke directly' to . . . domestic emissions of greenhouse gases.").  Here, the City has brought suit against two foreign oil and gas companies, BP and Shell, in addition to the U.S.-based Defendants, and all of the Defendants produce and sell fossil fuels on a global scale. (See Am. Compl. ¶ 76.) Thus, to the extent that the City seeks to hold Defendants liable for damages stemming from foreign greenhouse gas emissions, the City's claims are barred by the presumption against extraterritoriality and the need for judicial caution in

---

[2] One provision of the Clean Air Act, Section 115, authorizes the EPA to address the effects of air pollution from sources inside the United States in foreign countries. 42 U.S.C. § 7415(a).  However, the City's claims pertain to "worldwide" greenhouse gas emissions, not only those that originate in the United States.

the face of "serious foreign policy consequences." <u>Jesner v.</u>
<u>Arab Bank, PLC</u>, 138 S. Ct. 1386, 1407 (2018).

"The [Supreme] Court's recent precedents cast doubt on the
authority of courts to extend or create private causes of action
even in the realm of domestic law, where [the Supreme] Court has
'recently and repeatedly said that a decision to create a
private right of action is one better left to legislative
judgment in the great majority of cases.'" <u>Jesner</u>, 138 S. Ct. at
1402 (quoting <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692, 727
(2004)).  The Supreme Court recently held in <u>Jesner v. Arab</u>
<u>Bank, PLC</u>, 138 S. Ct. 1386 (2018), that where an action may have
significant foreign relations implications, "recognizing such
causes should make courts particularly wary of impinging on the
discretion of the Legislative and Executive Branches in managing
foreign affairs." <u>Id.</u> at 1399 (quoting <u>Sosa</u>, 542 U.S. at 727).
"The political branches, not the Judiciary, have the
responsibility and institutional capacity to weigh foreign-
policy concerns." <u>Id.</u> at 1403.

Here, the City seeks to hold Defendants liable for the
emissions that result from their worldwide production,
marketing, and sale of fossil fuels. (Am. Compl. ¶¶ 3, 70, 76,
79.)  The City alleges that "Defendants' cumulative production
of fossil fuels over many years makes each Defendant among the
top sources of [greenhouse gas] pollution in the world." (<u>Id.</u> ¶

76.)  Such claims implicate countless foreign governments and
their laws and policies.  This type of claim is the subject of
international agreements, including—although the United States
has expressed its intent to withdraw—the Paris Climate Accords.
The Court recognizes that the City, and many other governmental
entities around the United States and in other nations, will be
forced to grapple with the harmful impacts of climate change in
the coming decades.  However, the immense and complicated
problem of global warming requires a comprehensive solution that
weighs the global benefits of fossil fuel use with the gravity
of the impending harms.  To litigate such an action for injuries
from foreign greenhouse gas emissions in federal court would
severely infringe upon the foreign-policy decisions that are
squarely within the purview of the political branches of the
U.S. Government.  Accordingly, the Court will exercise
appropriate caution and decline to recognize such a cause of
action.

     The City argues that its claims do not present political
questions because the Second Circuit in AEP "reviewed this issue
in detail and rejected it, and the Supreme Court affirmed."
(Pl.'s Mem. at 23.)  However, the plaintiffs in AEP sought only
to "limit emissions from six domestic coal-fired electricity
plants." Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 325
(2d Cir. 2009), rev'd on other grounds by AEP, 564 U.S. 410.

The Second Circuit found that "[a] decision by a single federal court concerning a common law of nuisance cause of action, brought by domestic plaintiffs against domestic companies for domestic conduct, does not establish a <u>national</u> or <u>international</u> emissions policy." <u>Id.</u>  The City's claims against both foreign and domestic corporations, all five of whom produce and sell fossil fuels worldwide, are thus clearly distinguishable in this regard.

## CONCLUSION

For the reasons stated above, the U.S.-based Defendants' motion to dismiss is GRANTED and the City's amended complaint is dismissed with prejudice in its entirety.  The Clerk of Court is respectfully directed to terminate the motions docketed at ECF Nos. 95, 99, and 102 and to close this case.

**SO ORDERED.**

Dated:  New York, New York
        July 19 , 2018

                                    _John F. Keenan_____
                                    John F. Keenan
                                    United States District Judge